**Edward "Ted" BUDD, Appellant,**

v.

**MAX INTERNATIONAL, LLC, Appellee.**

No. 05–10–00986–CV.

Court of Appeals of Texas, Dallas.

May 5, 2011.

Theodore Anderson, W.D. Masterson, John H. Crouch, Robert Meyer Behrendt, Kilgore & Kilgore, PLLC, Dallas, TX, for Appellant.

Christopher J. Schwegmann, Lynn Tillotson & Pinker, L.L.P., Dallas, TX, for Appellee.

Before Justices MURPHY, FILLMORE, and MYERS.

## OPINION

Opinion By Justice FILLMORE.

The trial court granted Max International, LLC's motion to compel arbitration and dismissed this case in favor of arbitration. In one issue on appeal, Edward "Ted" Budd argues the trial court erred by granting the motion because the agreement to arbitrate is illusory. We affirm the trial court's order.

### Background

In February 2007, Budd became a "Max Associate" and sold Max's products as an independent contractor. In early 2010, Max terminated the parties' relationship. Budd brought suit based on the termination, asserting claims for violations of the Texas Deceptive Trade Practices Act, breach of contract, quantum meruit/unjust enrichment, fraud, and promissory estoppel.

Max filed a motion to compel mediation and arbitration and to dismiss the action and requested a "summary determination" compelling Budd to comply with the parties' agreement to arbitrate any disputes. Max asserted that, by entering into the independent contractor agreement, Budd agreed to be bound by Max's policies and procedures. Further, by continuing the parties' relationship, Budd agreed to be bound by any subsequent amendments of the policies and procedures. Max argued the policies and procedures in effect during the parties' relationship contained an agreement to arbitrate the parties' disputes.

Attached to Max's motion was the affidavit of Michael Szczesny, Max's Commissions Manager. Szczesny stated that Max markets its products and services through independent associates. An associate is an independent contractor, not an employee of Max. A prospective associate becomes affiliated with Max by submitting a paper application or "through an online process." Either procedure requires the prospective associate to agree to review and comply with Max's Statement of Policies and Procedures.

The record does not reflect what polices and procedures, if any, Max had in place in February 2007 when Budd became a Max associate. However, effective August 3, 2007, Max adopted a Statement of Policies and Procedures. The policies and procedures cover a broad range of topics pertaining to the relationship between Max and its associates. As relevant here, the policies and procedures provided:

1.1—Policies and Compensation Plan Incorporated into Associate Agreement

These Policies and Procedures, in their present form and as amended at the sole discretion of MAX Internation-

al, LLC (hereafter "MAX" or the "Company"), are incorporated into, and form an integral part of, the MAX Associate Agreement. Throughout these Policies, when the term "Agreement" is used, it collectively refers to the MAX Associate Application and Agreement, these Policies and Procedures, the MAX Plan, and the MAX Business Entity Application (if applicable). These documents are incorporated by reference into the MAX Associate Agreement (all in their current form and as amended by MAX). It is the responsibility of each Associate to read, understand, adhere to, and ensure that he or she is aware of and operating under the most current version of these Policies and Procedures....

1.2—Purpose of Policies

\* \* \*

MAX Associates are required to comply with all of the Terms and Conditions set forth in the Agreement which MAX may amend at its sole discretion from time to time, as well as all federal, state, and local laws governing their MAX business and their conduct....

1.3—Changes to the Agreement

Because federal, state, and local laws, as well as the business environment periodically change, MAX reserves the right to amend the Agreement and its prices in it sole and absolute discretion. By signing the Associate Agreement, an Associate agrees to abide by all amendments or modifications that MAX elects to make. Amendments shall be effective upon notice to all Associates that the Agreement has been modified. Notification of amendments shall be published in official MAX materials. The Company shall provide or make available to all Associates a complete copy of the amended provisions by one or more of the following methods: (1) posting on the Company's official web site; (2) electronic mail (e-mail); (3) inclusion in

Company periodicals; (4) inclusion in product orders or bonus checks; or (5) special mailings. The continuation of an Associate's MAX business or an Associate's acceptance of bonuses or commissions constitutes acceptance of any and all amendments.

8.3—Arbitration

**Any controversy or claim arising out of or relating to the Agreement, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.** Associates waive all rights to trial by jury or to any court.... This agreement to arbitration [sic] shall survive any termination or expiration of the Agreement.

(Emphasis in original). The policies and procedures also provided the arbitration would be governed by the Federal Arbitration Act (FAA).

Szczesny stated that on May 15, 2008, Max issued a check to Budd. On the front of the check Max included the statement, "By cashing this check I agree to abide by the current policies and procedures." Budd cashed the check in May 2008.

Szczesny also stated that each associate was required to pay an annual renewal fee. After an associate renewed his account, Max's secure database, which was used to monitor the operation of an associate's individual business, automatically required the associate to agree to be bound by the current polices and procedures before the associate could again access his account. According to Szczesny, Budd paid a renewal fee on April 15, 2009. Budd accessed his account after April 15, 2009, which could not have occurred unless he agreed to be bound by the policies and procedures.

Effective May 11, 2009, Max amended its policies and procedures. According to Szczesny, the changes were posted on Max's website. As relevant in this case, section 1.3 of the polices and procedures was amended to provide that, "Amendments shall be effective 30 days after publication of notice that the Agreement has been modified." A new section 8.3 was added to the policies and procedures that required non-binding mediation prior to any party instituting an arbitration. The previous section 8.3, dealing with arbitration, was renumbered as section 8.4. The polices were again amended effective October 9, 2009, but the October 9th amendments are not relevant in this case. The log-in information attached to Szczesny's affidavit shows Budd continued to access his account following the May 11, 2009 and October 9, 2009 amendments to the policies and procedures.

Budd responded to Max's motion, arguing the arbitration agreement was illusory because Max could unilaterally modify the policies and procedures at any time. The trial court granted Max's motion to compel arbitration and dismissed the case without prejudice "in favor of arbitration."

## Analysis

Whether an arbitration agreement is enforceable is a question of law subject to de novo review. *In re 24R, Inc.*, 324 S.W.3d 564, 566 (Tex.2010) (orig.proceeding) (per curiam); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex.

2003). A party seeking to compel arbitration under the FAA must (1) establish the existence of a valid arbitration agreement; and (2) show that the claims asserted are within the scope of the agreement. *In re AdvancePCS Health L.P.*, 172 S.W.3d 603, 605 (Tex.2005) (orig.proceeding) (per curiam). In determining the validity of agreements to arbitrate which are subject to the FAA, we generally apply ordinary state contract law principles governing the formation of contracts. *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 676 (Tex. 2006) (orig.proceeding) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)).[1]

Because the record does not reflect that Max had any polices and procedures in place at the time Budd became a Max associate in February 2007, we cannot conclude the arbitration clause was part of the parties' underlying contract. *See AdvancePCS Health*, 172 S.W.3d at 607.[2] Any agreement to arbitrate contained in the policies and procedure would, therefore, be a stand-alone agreement and must be supported by "binding promises" on both sides as consideration for the agreement. *Id.* (citing *In re Halliburton Co.*, 80 S.W.3d 566, 569 (Tex.2002) (orig.proceeding)).

Budd does not dispute Max's evidence that after August 2007 Budd agreed to be bound by the policies and procedures and the amendments to the policies and procedures. He also does not dispute that he

---

1. Although the policies and procedures provide that the law of the State of Utah shall govern all matters relating to or arising from the policies and procedures, neither party has argued that Utah's contract law should be applied or that Utah's law differs substantially from that of Texas. Accordingly, we will apply the contract-law principles of Texas. *See Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711, 720 (Tex.App.-Dallas 2004, no pet.).

2. This case is factually distinguishable from our opinion issued today in *Dorfman v. Max International, LLC*, No. 05–10–00776–CV, in which the August 3, 2007 Statement of Policies and Procedures was in effect at the time Ms. Dorfman entered into the Max associate agreement and were, therefore, part of the parties' underlying contract.

continued to work as an independent contractor after the policies and procedures were in effect and after the polices and procedures were amended. He does not claim that he failed to receive notice of the August 3, 2007 policies and procedures or the subsequent amendments to the policies and procedures. He does not dispute the policies and procedures contained a clause requiring the parties to arbitrate any dispute relating to Budd's work as a Max associate.

Budd did not argue either in the trial court or in his brief on appeal that he is not bound by the policies and procedures or that his claims do not fall within the scope of the arbitration clause. Rather, relying primarily on *J.M. Davidson*, Budd argues only that the agreement to arbitrate was illusory and unenforceable because Max "could clearly have amended or deleted the arbitration agreement at any time."

 Mutual promises to submit a dispute to arbitration constitute sufficient consideration to support an arbitration agreement. *24R, Inc.*, 324 S.W.3d at 566. However, an arbitration agreement may be illusory if a party can unilaterally avoid the agreement to arbitrate. *Palm Harbor Homes*, 195 S.W.3d at 677. Stated otherwise, a promise is illusory when it fails to bind the promisor, such as when the promisor retains the option of discontinuing performance. *24R, Inc.*, 324 S.W.3d at 567. "When illusory promises are all that support a purported bilateral contract, there is no mutuality of obligation, and, therefore, no contract." *Id.*

In *Halliburton*, the supreme court considered an arbitration agreement between an employer and an at-will employee which gave the company the right to modify or terminate the arbitration clause. However, the agreement provided that any modification to the arbitration clause was not to apply retroactively to a dispute of which

Halliburton had notice on the day of the amendment. *Id.* at 569–70 It also stated that if Halliburton terminated the arbitration program, "termination shall not be effective until 10 days after reasonable notice of termination is given to Employees or as to Disputes which arose prior to the date of termination." *Id.* at 570. Because of these two provisions, Halliburton could not "avoid its promise to arbitrate by amending the provision or terminating it altogether" and the provision was not illusory. *Id.*

In *J.M. Davidson*, the supreme court considered an agreement to arbitrate contained in an employer's personnel policy. The employer had "reserve[d] the right to unilaterally abolish or modify any personnel policy without prior notice." *J.M. Davidson*, 128 S.W.3d at 229. The supreme court recognized that an employer's right to unilaterally abolish or amend an arbitration clause without notice could render the arbitration clause in an employment agreement illusory. *Id.* at 230 & n. 2. However, the supreme court remanded the case to the trial court because the agreement was ambiguous as to whether the right to unilaterally abolish personnel policies applied to the arbitration clause. *Id.* at 230–31

In *AdvancePCS Health*, the supreme court considered the validity of an arbitration clause contained in a provider agreement between a pharmacy benefits management company and member pharmacies. AdvancePCS could modify the arbitration clause upon 30 days' notice to a member pharmacy, and it could terminate the agreement immediately if the member pharmacy failed to perform or breached a provision in the contract. *AdvancePCS Health*, 172 S.W.3d at 607. The court concluded AdvancePCS's ability to modify the clause did not render it illusory because it "provides a 30–day window during which

the arbitration clause cannot be cancelled." *Id.* The court also determined AdvancePCS's ability to terminate the agreement upon breach did not make the clause illusory because the contract provided that "any obligations that arise prior to the termination of the Agreement shall survive such termination." *Id.* The court explained that because of this provision, "[h]ad the pharmacies invoked arbitration rather than filing suit, [Advance]PCS could not have avoided arbitration by terminating the Provider Agreement." *Id.* at 607–08. Accordingly, the arbitration clause was not illusory.

■■ In sum, even if a party has the right to unilaterally modify or terminate an arbitration clause, if the modification or elimination of the clause does not apply retroactively so as to allow the party to avoid the promise to arbitrate, the arbitration clause is not illusory. *See In re Odyssey Healthcare, Inc.,* 310 S.W.3d 419, 424 (Tex.) (orig.proceeding) (per curiam) ("Moreover, an arbitration clause is not illusory unless one party can avoid its promise to arbitrate by amending the provision or terminating it altogether."), *cert. denied by Morales v. Odyssey Healthcare, Inc.,* — U.S. ——, 131 S.Ct. 319, 178 L.Ed.2d 145 (2010); *AdvancePCS Health,* 172 S.W.3d at 607–08; *Halliburton,* 80 S.W.3d at 570. Here, the policies and procedures gave Max the right to amend the policies and procedures "in its sole and absolute discretion." However, under the amended policies and procedures in effect at the time the parties' relationship was terminated, any amendments did not become effective until thirty days after Max gave notice of the modifications. Further, the agreement to arbitrate expressly survived any termination or expiration of the parties' relationship. It also survived the termination or expiration of the policies and procedures with respect to claims arising while the policies and procedures were in effect. Therefore, any amendment to or

termination of the arbitration agreement would not apply retroactively to claims pending at the time of the amendment or termination.

Because Max could not unilaterally avoid arbitration of existing claims by modifying or terminating the arbitration provision, the agreement to arbitrate is not illusory. *See In re Polymerica, LLC,* 296 S.W.3d 74, 76 (Tex.2009) (orig.proceeding) (per curiam) (agreement to arbitrate not illusory because termination provision required notice to employees and applied prospectively only); *AdvancePCS Health,* 172 S.W.3d at 607–08; *Halliburton,* 80 S.W.3d at 570. Accordingly, the trial court did not err by granting Max's motion to compel arbitration. We overrule Budd's sole issue and affirm the trial court's order.