# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-CA-01238-SCT

*GREGORY G. NETHERY*

*v.*

*CAPITALSOUTH PARTNERS FUND II, L.P.,
CAPITALSOUTH PARTNERS SBIC FUND III,
L.P., CAPITALSOUTH PARTNERS FLORIDA
SIDECAR FUND I, LP, CAPITALSOUTH
PARTNERS, LLC, HARBERT MEZZANINE
PARTNERS III SBIC, LP, HARBERT
MEZZANINE PARTNERS III, LP PROPERLY
KNOWN AS HARBERT MEZZANINE III, LP f/k/a
HARBERT MEZZANINE PARTNERS III SBIC,
LP, ON-SITE FUEL SERVICE, INC. AND ON-
SITE FUEL HOLDINGS, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/25/2017 |
| TRIAL JUDGE: | HON. WILLIAM E. CHAPMAN, III |
| TRIAL COURT ATTORNEYS: | CECIL MAISON HEIDELBERG |
| | KAYTIE MICHELLE PICKETT |
| | EMERSON BARNEY ROBINSON, III |
| | PHILIP W. THOMAS |
| | ADAM STONE |
| | J. KEVIN WATSON |
| | PHIL B. ABERNETHY |
| | JOHN HOUSTON DOLLARHIDE |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | CECIL MAISON HEIDELBERG |
| | J. KEVIN WATSON |
| ATTORNEYS FOR APPELLEES: | KAYTIE MICHELLE PICKETT |
| | ADAM STONE |
| | JACKIE RAY BOST, II |
| | EMERSON BARNEY ROBINSON, III |
| | PHIL B. ABERNETHY |
| | JOHN HOUSTON DOLLARHIDE |
| | PHILIP W. THOMAS |
| NATURE OF THE CASE: | CIVIL - OTHER |

DISPOSITION:                AFFIRMED - 11/15/2018
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE KITCHENS, P.J., BEAM AND CHAMBERLIN, JJ.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.     Gregory Nethery appeals from the Rankin County Circuit Court's decision to grant a motion to compel arbitration filed by Defendants CapitalSouth Partners,[1] Harbert Mezzanine Partners, and On-Site Fuel Services (collectively, "Defendants").[2] Finding the circuit court properly granted Defendants' motion to compel arbitration, we affirm.

## COURSE OF PROCEEDINGS

¶2.     Nethery founded On-Site Fuel Service, Inc. (OSFS), in 1996. In 2011, Defendants CapitalSouth and Harbert approached Nethery about acquiring an ownership interest in OSFS. A deal was consummated for CaptialSouth and Harbert to invest in OSFS, and OSFS then used the investment capital to buy out two other longtime investors. On-Site Fuel Holdings (OSFH) was then created as a holding company. OSFH is a Delaware corporation that owns OSFS and does business in interstate commerce and in Mississippi.

¶3.     Nethery retained a minority thirty-percent ownership interest in OSFS through his stock interest in OSFH. CapitalSouth and Harbert each held the remaining interest. No shareholder owns more than fifty percent of the holding company.

---

[1] CapitalSouth Defendants are CapitalSouth Partners Fund II, L.P.; CapitalSouth Partners SBIC, Fund III, L.P.; CapitalSouth Partners, Florida Sidecar Fund I, L.P.; and CapitalSouth Partners, LLC.

[2] On-Site Fuel Defendants are On-Site Fuel Service, Inc., and On-Site Fuel Holdings, Inc.

¶4.    As part of the deal, Nethery signed a Stockholders Agreement containing an arbitration clause (denoted as Section 5.03(b) of the agreement), which provided the following:

> Except as provided in Section 6.03(a),[3] any dispute among the parties hereto shall, on demand of any party to such dispute, be submitted to binding arbitration in Charlotte, North Carolina, conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association by a panel of three impartial arbitrators selected in accordance with such Commercial Arbitration Rules, and judgment upon the award may be entered in any court of competent jurisdiction.  In rendering the award, the arbitrators shall enforce this Agreement in accordance with its terms and in accordance with applicable law, and shall assess the costs of such arbitration as they deem just and equitable in light of their determination of the issues being arbitrated.

¶5.    In October 2016, Nethery filed suit in circuit court against CapitalSouth and Harbert, claiming breach of fiduciary duty, corporate freeze out, unjust enrichment, constructive trust, civil conspiracy, and negligence and mismanagement.[4]

---

[3] This is a typographical error.  Section 5.03(b) clearly refers to Section 5.03(a), not Section 6.03(a), because no Section 6 is contained in the Stockholders Agreement.  Section 5.03(a) provided the following:

> Each Stockholder acknowledges and agrees that in the event of any breach of this Agreement, the non-breaching party or parties would be irreparably harmed and could not be made whole by monetary damages, and therefore each Stockholder hereby waives the defense in any action for specific performance or injunctive relief that a remedy at law would be adequate.  Each Stockholder further agrees that all other Stockholders, in addition to any other remedy to which they may be entitled at law or in equity, shall be entitled to compel specific performance of this Agreement and to obtain injunctive relief in any action instituted in a court of proper jurisdiction.

[4] Nethery did not plead a cause of action against OSFS, but he named it as a defendant in order to "seek the remedy of an accounting."

¶6.    In the complaint, Nethery claimed that OSFS, under his continued guidance, transitioned well from CapitalSouth's and Harbert's entry into the business, growing "Earnings Before Interest, Taxes, Depreciation and Amortization" (EBITDA) substantially, which in turn "grew enterprise value." Due to the growth, OSFS was contacted by numerous investment groups interested in acquisition. But CapitalSouth and Harbert refused to engage seriously in these opportunities that "would have benefited all stockholders handsomely."

¶7.    In December 2013, CapitalSouth and Harbert appointed their own executive to be present at the company offices on a regular basis. In 2014, Nethery claims he began to be excluded from company and departmental meetings. Nethery confronted CapitalSouth and Harbert about his exclusion from company business to no avail.

¶8.    In June 2014, Nethery says he was invited to Atlanta to meet with CapitalSouth principals. CapitalSouth demanded core changes in the company and told Nethery these demands were better than asking for Nethery's resignation.

¶9.    According to Nethery, CapitalSouth Defendants suspended him later that same month "under the guise of false and specious allegations." And in July 2014, Nethery was terminated without cause.

¶10.    Nethery claims that since his termination, "the company's trajectory has spiraled in a 180-direction." The company reported approximately $8 million in losses during 2015, and shareholder equity essentially vanished. But the majority shareholders "profited in spite of the losses by implementing a loan arrangement with the company where they collect over

4

$250,000 per month through interest and accruals." Through their loans to the company, the majority shareholders "drain cash flow, handcuffing the company, while they benefit."

¶11.   Nethery claims that at all times, CapitalSouth and Harbert "conspired together and acted in concert on behalf of themselves and each other, taking the positions of each other, and acting in one block to control the voting of the company." Considering their combined majority interest, CapitalSouth and Harbert worked together for themselves and against the interests of Nethery, the minority shareholder.

¶12.   Defendants answered Nethery's complaint, asserting the affirmative defense of arbitration, and filed their motion to compel arbitration that same day. The circuit court granted the motion and stayed the action filed by Nethery pending the completion of any resulting arbitration.

¶13.   As he claimed in the circuit court, Nethery maintains on appeal that, based upon a choice-of-law provision contained in the Stockholders Agreement, Delaware law governs interpretation of the agreement.[5] Nethery contends that under Delaware law, the arbitration clause does not apply because Nethery's complaint does not allege breach of the Stockholders Agreement, nor does Nethery seek legal relief under the agreement. Rather, Nethery asserts only noncontractual state-law claims and his legal claims exist independently from the contract.

---

[5] Section 5.07 of the Stockholders Agreement provides, "The laws of the State of Delaware, excluding the principles of conflicts of law thereof, shall govern the interpretation, validity and performance of the terms of this Agreement."

¶14. Nethery contends the Delaware Supreme Court's decision in ***Parfi Holding AB v. Mirror Image Internet, Inc.***, 817 A.2d 149, 155 (Del. 2002), controls. Under ***Parfi***'s analysis dealing with an arbitration clause contained in a "stock underwriting agreement," Nethery argues his independent state-law claims fall outside the scope of the arbitration agreement; therefore, according to Nethery, they are not subject to arbitration.

¶15. Defendants respond that Delaware law is inapplicable, and it is also preempted by the Federal Arbitration Act (FAA). Alternatively, the Defendants contend that, even if Delaware law does apply, ***Parfi*** is distinguishable, and the controlling case is ***Elf Atochem North America, Inc. v. Jaffari***, 727 A.2d 286, 294 (Del. 1999).

¶16. The Defendants further contend that, because the arbitration agreement incorporates the Rules of the American Arbitration Association (AAA), the parties intended to delegate questions of arbitrability to an arbitrator (in this case, an arbitration panel). Thus, they continue that the scope of the arbitration agreement should be determined by an arbitration panel, not the court.

## DISCUSSION

¶17. At the outset, we agree with Nethery that Delaware law governs interpretation of Stockholders Agreement, based upon the agreement's choice-of-law provision. In turn, Delaware law governs the arbitration provision incorporated into the agreement. And because the Stockholders Agreement indisputably involves interstate commerce, the Federal Arbitration Act (FAA) governs. ***James & Jackson, LLC v. Willie Gary, LLC***, 906 A.2d 76, 80 (Del. 2006).

6

¶18.   "The FAA requires that upon application of a party to a suit brought in court, the court shall stay the court proceeding 'upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration . . . .'"  *McLaughlin v. McCann*, 942 A.2d 616, 621 (Del. Ch. 2008).  "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally should apply ordinary state-law principles that govern the formation of contracts." *Id.*  (quoting *First Options of Chicago, Inc., v. Kaplan*, 514 U.S. 938, 944, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995)).  Generally, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985)).

¶19.   In applying traditional state-contract-law principles to make a determination on the question of arbitrability, "the court presumes that parties intended courts to decide issues of substantive arbitrability[,] unless 'the parties clearly and unmistakably provide otherwise.'" *Willie Gary*, 906 A.2d at 79 (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83, 123 S. Ct. 588, 154 L. Ed. 2d 491 (2002)).

**Arbitrability**

¶20.   As a threshold issue, Delaware has adopted "the majority federal view that reference to the AAA rules evidences a clear and unmistakable intent to submit arbitrability issues to an arbitrator." *Willie Gary*, 906 A.2d at 80.  *Willie Gary* provides,

> As a matter of policy, we adopt the majority federal view that reference to the AAA rules evidences a clear and unmistakable intent to submit arbitrability issues to an arbitrator.  We do so in the belief that Delaware benefits from adopting a widely held interpretation of the applicable rule, as long as that

7

interpretation is not unreasonable. The majority view does not, however, mandate that arbitrators decide arbitrability in all cases where an arbitration clause incorporates the AAA rules. Rather, it applies in those cases where the arbitration clause generally provides for arbitration of all disputes and also incorporates a set of arbitration rules that empower arbitrators to decide arbitrability.

*Id.*

¶21. Thus, under Delaware law, "the parties are deemed to have agreed to arbitrate substantive arbitrability in accordance with the rules that they have broadly incorporated," under two conditions: "(1) the arbitration provision refers to the AAA or comparable rules and (2) the arbitration clause generally provides for the arbitration of all disputes." *Roberts v. Strickland*, No. CV 510-081, 2010 WL 11553201, *1 (S.D. Ga. Dec. 10, 2010) (quoting *GTSI Corp. v. Eyak Tech., LLC*, 10 A.3d 1116, 1120-21 (Del. Ch. 2010)).

¶22. In *Willie Gary*, the Delaware Supreme Court held that, even though the arbitration clause before it had incorporated the AAA rules, the federal majority rule did not apply. *Id.* at 81. Because the arbitration clause contained in the parties' "LLC agreement" also allowed LLC members to pursue injunctive relief and specific performance in the court, the Delaware Supreme Court reasoned that the arbitration clause did not refer "all controversies to arbitration, . . . and something other than the incorporation of the AAA rules would be needed to establish that the parties intended to submit arbitrability questions to an arbitrator." *Id.* at 81.

¶23. Here, similar to the LLC agreement construed in *Willie Gary*, the arbitration clause under Section 5.03(b) of the Stockholders Agreement generally refers all disputes arising or relating to the Stockholders Agreement to arbitration, and the clause specifically incorporates

8

the Commercial Arbitration Rules of the AAA. But also similar to *Willie Gary*, the language contained in Section 5.03(a) allows the parties to pursue claims for injunctive relief and specific performance in the court.

¶24. While Nethery does not seek injunctive or specific-performance relief, unlike as was the case in *Willie Gary*,[6] we think Section 5.03 fails under *Willie Gary*'s second prong. Under *Willie Gary*, Section 5.03(a) constitutes a carve-out provision providing judicial remedies for disputes. Given its inclusion in the agreement, we think "something other than incorporation of the AAA rules would be needed to establish that the parties intended to submit arbitrability questions to an arbitrator." *Id.* at 81. Accordingly, we find that the question of arbitrability in this case was an issue for the circuit court's determination; it was not an issue for determination by an arbitration panel.

¶25. The circuit court's order compelled Nethery to arbitrate all of his claims against the defendants in accordance with the arbitration clause contained in the parties' Stockholders Agreement. For reasons explained below, we affirm the circuit court's order.

**Scope**

¶26. In *Parfi*, the Delaware Supreme Court established a two-part test for determining whether a dispute is committed to arbitration:

> First, the court must determine whether the arbitration clause is broad or narrow in scope. Second, the court must apply the relevant scope of the provision to the asserted legal claim to determine whether the claim falls within the scope of the contractual provisions that require arbitration. If the

---

[6] In *Willie Gary*, the complainant had sought injunctive relief, specific performance, and, alternatively, dissolution. *Willie Gary*, 906 A.2d at 78. No other relief was sought. *Id.* Here, Nethery seeks monetary damages only.

9

court is evaluating a narrow arbitration clause, it will ask if the cause of action pursued in court directly relates to a right in the contract. If the arbitration clause is broad in scope, the court will defer to arbitration on any issues that touch on contract rights or contract performance.

*Parfi*, 817 A.2d at 155.

¶27. The issue before the Delaware Supreme Court in *Parfi* was whether an arbitration clause in an underwriting agreement should control in a minority shareholder's fiduciary-duty claims against a corporation. *Id.* at 155-56. The *Parfi* court found at the outset that the arbitration clause was broad in scope. "By agreeing to submit to arbitration any dispute, controversy, or claim arising out of or in connection with Underwriting Agreement, [the parties] have signaled an intent to arbitrate all possible claims that touch on the rights set forth in their contract." *Id.* at 155. Even though the *Parfi* Court found the arbitration clause was broad in scope, it said the actual question before it was "whether the arbitrable contract claims are connected to the fiduciary duty claims that are independently grounded on Delaware corporation law." *Id.*

¶28. In answering the question, the *Parfi* court said, "Generally, purportedly independent actions do not touch matters implicated in a contract if the independent cause of action could be brought had the parties not signed a contract." *Id.* at 156 n.24. Applying this test, the *Parfi* court concluded that because the fiduciary claims "would be independently and separately assertable" even if no underwriting agreement existed, they are "not 'in connection' with the Agreement." *Id.* at 157. That is to say, because the fiduciary claims did not depend in any manner on the underwriting agreement, the *Parfi* court found that the claims were not arbitrable. *Id.*

10

¶29. The *Parfi* court, however, was careful to distinguish its case, which involved a separate underwriting agreement not binding on all the stockholders of the corporation, and the situation in *Jaffari*. In *Jaffari*, the Delaware Supreme Court held that a broad arbitration provision in an LLC Agreement could encompass breach-of-fiduciary-duty claims raised by a member. *Jaffari*, 727 A.2d at 295. And as *Parfi* itself summarized, the LLC agreement in *Jaffari* required "parties to submit purported fiduciary duty claims to arbitration since the series of agreements created a system setting for[th] the governance and operation of the parties' joint venture." *Parfi*, 817 A.2d at 160 n.42 (citing *Jaffari*, 727 A.2d at 293-95).

¶30. Here, the arbitration provision contained in the Stockholders Agreement is broad in scope, because it governs "[a]ny dispute among the parties." The Stockholders Agreement governs the relationship between stockholders (CapitalSouth, Harbert, Sidecar, and Nethery) who expressed the "desire to enter into this Agreement for the purpose of agreeing to certain aspects of their relationship as holders of such capital stock."

¶31. This relationship, as the Defendants argue, is directly related to Nethery's primary allegation: "Due to the majority shareholders' actions, the company has become encumbered with high interest debt to the majority shareholders and/or their entities, a benefit to the majority shareholders and a detriment to the minority shareholders."

¶32. Section 3.04 of the Stockholders Agreement provides,

> Major Management Decisions. The following acts, expenditures, decisions and obligations made or incurred by the Company or any Subsidiary shall require the prior written approval of the Required Investors (unless the Required Investors indicate otherwise in writing prior to any action by the Board, approval by the CapitalSouth Nominees and the Harbert Nominees at a meeting or by written consent shall constitute the approval of the Required

11

Investors for the purposes of this Section 3.04):

. . . .

(h) the incurrence of Debt, other than borrowings under any revolving line of credit that has been approved hereunder, or the sale or issuance by the Company or any Subsidiary of any equity security of the Company or any Subidiary;

(i) the guarantee of any obligation (including Debt) in excess of $100,000 of any Person, other than a Company Subsidiary.

¶33. Section 5.14 of the Stockholders Agreement provides,

No Effect on Lending Relationships. To the extent any lender to the Company owns any Company Securities, nothing contained in this Agreement or any other equity documentation shall affect, limit or impair the rights and remedies of any lender to the Company in its capacity as a lender pursuant to any agreement under which the Company has borrowed money from such Person.

¶34. Section 5.16 provides,

Discussion re Purchase of Nethery's Company Securities. Upon termination of Nethery's employment with the Company and its Subsidiaries for any reason, the Company and Nethery shall negotiate in good faith with respect to a potential repurchase of the Nethery's Company Securities by the Company. In connection with such negotiations, upon the request of Nethery, the Company shall engage a national or regional investment bank or business appraiser who shall be mutually acceptable to the Company and Nethery, to provide a non-binding determination of the fair market value of such Company Securities. The costs of such appraisal shall be born[e] 50% by Nethery and 50% by the Company.

¶35. The conduct in which Nethery alleges the Defendants engaged (and which forms the basis for each of Nethery's state-law claims) arises from the authority provided by the Stockholders Agreement and its provisions therein—Sections 3.04(h) and (i) and Section 5.14 of the Stockholders Agreement, in particular. The alleged conduct is dependent on the

12

agreement's terms and is not "independently and separately assertable" apart from the Stockholders Agreement. *Cf*. ***Parfi***, 817 A.2d at 157. Thus, the circuit court correctly found that Nethery's claims are subject to the agreement's arbitration provision.

## CONCLUSION

¶36.    For these reasons, we affirm the circuit court's order granting the defendants' motion to compel arbitration.

¶37.    **AFFIRMED.**

**WALLER, C.J., RANDOLPH AND KITCHENS, P.JJ., KING, COLEMAN, MAXWELL, CHAMBERLIN AND ISHEE, JJ., CONCUR.**