# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-CA-01115-SCT

*McINNIS ELECTRIC COMPANY*

*v.*

*BRASFIELD & GORRIE, LLC, AND JAMES MAPP*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/13/2021 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| TRIAL COURT ATTORNEYS: | SHIRLEY PAYNE |
| | CYNTHIA ANN STEWART |
| | DENNIS L. HORN |
| | R. LANE DOSSETT |
| | RALPH B. GERMANY, JR. |
| | SIMON TURNER BAILEY |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | DENNIS L. HORN |
| | R. LANE DOSSETT |
| | SHIRLEY PAYNE |
| | LEIGH KATHRYN PAYNE HORN |
| ATTORNEYS FOR APPELLEES | RALPH B. GERMANY, JR. |
| | SIMON TURNER BAILEY |
| | RANKIN SUMNER FORTENBERRY |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 10/19/2023 |
| MOTION FOR REHEARING FILED: | |

## CONSOLIDATED WITH

## NO. 2021-CA-01300-SCT

*McINNIS ELECTRIC COMPANY*

*v.*

*BRASFIELD & GORRIE, LLC, AND JAMES MAPP*

DATE OF JUDGMENT: 09/13/2021
TRIAL JUDGE: HON. WINSTON L. KIDD
COURT FROM WHICH APPEALED: HINDS COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT: DENNIS L. HORN
 SHIRLEY PAYNE
 R. LANE DOSSETT
 LEIGH KATHRYN PAYNE HORN
ATTORNEYS FOR APPELLEE: RALPH B. GERMANY, JR.
 SIMON TURNER BAILEY
 RANKIN SUMMER FORTENBERRY
NATURE OF THE CASE: CIVIL - CONTRACT
DISPOSITION: AFFIRMED - 10/19/2023
MOTION FOR REHEARING FILED:

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1. The instant matter stems from disagreements and a broken contract between a contractor and subcontractor allegedly brought on by the COVID-19 pandemic. They contest whether arbitration is appropriate to settle their disputes. The trial court compelled arbitration, and we affirm.

## FACTS

¶2. Construction firm Brasfield & Gorrie, LLC, received the prime contract to expand the University of Mississippi Medical Center Children's Hospital in 2017. Electrical contractor McInnis Electric Company secured the winning bid to install the electrical and low voltage systems package for the project and subsequently signed a subcontract with Brasfield & Gorrie. Terms of the subcontract incorporated the prime contract, which were related to the same project by reference.

2

¶3.     The subcontract signed by both parties states, "THIS CONTRACT IS SUBJECT TO ARBITRATION."   It also provides a specific provision regarding "CLAIMS AND DISPUTES; ARBITRATION."   There, the parties stipulated that they "intend[ed] that all claims of Subcontractor (McInnis) shall be resolved in accordance with the provisions of the Contract Documents and this Subcontract . . . ."   Later in the same article, the process for all claims handled and resolved under a dispute resolution process with the owner, *i.e.*, the children's hospital,  is outlined.   It further provides as follows:

> any disputes between Contractor and Subcontractor not resolved under Paragraph 29.2, including any disputes in which Subcontractor has a claim against another subcontractor, shall be finally determined by binding arbitration in accordance with the current Construction Industry Rules of the American Arbitration Association by one or more arbitrators selected in accordance with said Rules. The parties acknowledge that this Subcontract evidences a transaction involving interstate commerce and that this agreement to arbitrate is enforceable under 9 U.S.C. §§ 1, et seq.[1]

¶4.     Additionally, the terms of the contract provided that work was set to begin on the project on February 15, 2018.   However, McInnis, was directed not to report on site until June 4, 2018, and, due to delays, was unable to begin until July 23, 2018.   McInnis's work began with underground construction of a complex web of conduits, which were successfully installed, with the exception of damage caused by the concrete contractor.   As work progressed, the schedule allegedly became delayed as a result of Brasfield & Gorrie's failure to coordinate the work of the various subcontractors.   By August 1, 2019, scheduled construction was six months behind.   By fall 2019, nearly a thousand Requests for

---

[1] 9 U.S.C. §§ 1-16 is commonly referred to as the Federal Arbitration Act.

Information and Construction Products Regulation had been issued, revealing significant issues with contractual documents and drawings.

¶5. McInnis avers that Brasfield & Gorrie's failure to coordinate and facilitate the work of the various subcontractors worsened as the project progressed, and Brasfield & Gorrie experienced turnover in management. For example, the sheetrock contractor and the plumbing contractor were required to complete the patient rooms of the upper floors in specific sequence coordinated with all trades, but allegedly no attempt was made for sequencing. Additionally, there were instances in which patient room electrical conduit installations were delayed because windows and headwalls had not yet been installed by other subcontractors. The failure of these and other predecessor activities allegedly delayed McInnis's work, which was not on the path toward completion, supposedly through no fault of its own.

¶6. Construction issues were amplified when on March 11, 2020, Mississippi experienced its first reported case of COVID-19. Five days later, the National Electrical Contractors Association announced a national disease emergency response agreement with the National Electrical Union. McInnis received such notice and informed Brasfield & Gorrie. On March 24, 2020, McInnis notified Brasfield & Gorrie of workplace safety concerns related to COVID-19, but these concerns were supposedly ignored. Brasfield & Gorrie, realizing that the predecessor activities had resulted in substantial delays, sought to make up for lost time by "squeezing" McInnis. As the threat of the pandemic increased, Brasfield & Gorrie

declined to implement additional health and safety measures[2] and instead increased contribution to McInnis's workforce through workforce contractor workers from an outside workforce management group. The intermingling of new employees from a job site that had been shut down due to COVID-19 created fear among some workers. As the project and its timeline deteriorated, one of Brasfield & Gorrie's supervisors, Defendant James Mapp, allegedly destroyed McInnis's materials on the job site, evidencing the growing animosity between the companies.

¶7.     On April 1, 2020, Governor Tate Reeves instituted a shelter in place order in response to the ongoing pandemic, requiring certain nonessential businesses to close and recommending social distancing to reduce the spread of the coronavirus in Mississippi. Executive Order Number 1463 provided that building and construction should be halted during the ongoing pandemic except for maintaining essential preexisting infrastructure. The children's hospital was not classified as an existing infrastructure as it was a nonoperational work in progress and thus was not subject to the executive order's exception to the governmental shutdowns.

¶8.     By May 8, 2020, McInnis had suffered an approximately 40 percent loss in its workforce due to employees testing positive for COVID-19. Despite the decrease in the available workforce, Brasfield & Gorrie demanded McInnis perform under its contractual obligation. McInnis took measures to continue the work, including making $94,000 in

---

[2]In March 2020, the secretary of the United States Department of Health and Human Services issued a declaration regarding COVID-19 pandemic, requiring counter measures such as N95 respirators/face shields and an infection control program.

hazard payments to incentivize its workers to remain on site. McInnis also requested a ten-day suspension of the work as an accommodation to finish the work safely.

¶9. On May 13, 2020, Brasfield & Gorrie responded to McInnis's requests by stating that when any worker tested positive for COVID-19, that worker should self-quarantine. The same day, Brasfield & Gorrie issued a detailed response to McInnis's other requests for additional pandemic relief with a letter denying all of McInnis's allegations of potential harm, ignoring Brasfield & Gorrie's expert's directive for added safety precautions, denying the scope of illness in the McInnis workforce, and demanding that McInnis continue to perform or face expulsion from the project. Brasfield & Gorrie further declined requests for accommodation and instead terminated McInnis on May 13, 2020.

¶10. After McInnis's supposed default, the parties conferred. On April 5, 2021, while conferral was ongoing and believing that a demand for arbitration was imminent, McInnis filed the underlying lawsuit. It then amended its complaint. McInnis's complaint attached the prime contract and referenced the subcontract throughout, including allegations that Brasfield & Gorrie committed breach of contract by failing to provide a safe work environment under article 10 of the prime contract and by failing to "stop work . . . once the job site was deemed unsafe" under article 17 of the subcontract. Each count in the complaint, including tort claims, referenced the subcontract.

¶11. Brasfield & Gorrie argues in its brief that in an apparent attempt to defeat diversity jurisdiction and removal, McInnis joined Brasfield & Gorrie Superintendent James Mapp,

6

alleging that he was a Mississippi resident. McInnis alleged that Mapp disposed of a pallet of steel conduit that McInnis left at the job site, claiming that Mapp committed conversion and trespass to chattel. The subcontract required McInnis to keep the job site clean and authorized Brasfield & Gorrie to clean up if McInnis failed to do so. Brasfield & Gorrie ratified and embraced the cleanup work Mapp did on its behalf.

¶12. The circuit court held the initial hearing on the arbitration issue on August 23, 2021, and granted McInnis's motion to temporarily enjoin arbitration in an Order Granting Temporary Restraining Order for fourteen days to "allow the Court to issue an opinion and order." On September 13, 2021, in his final order, the trial judge granted Brasfield & Gorrie's motion to compel arbitration and to stay litigation.

¶13. On October 1, 2021, McInnis petitioned for interlocutory appeal. Since that time, the Mississippi Supreme Court has entered numerous orders. First, on November 30, 2021, we held that McInnis's petition for interlocutory appeal should be deemed a notice of appeal and that the appeal of the matter should proceed under Mississippi Rule of Appellate Procedure 3. A panel of this Court then granted McInnis's motion to stay. Third, the panel passed for consideration along with the merits the motion to dismiss the appeal filed by Defendants. The motion to dismiss was then withdrawn. On January 20, 2022, the Court ordered the consolidation of McInnis's interlocutory appeal with the appeal of the underlying trial court order. We denied Brasfield & Gorrie's "Motion to Suspend Rules [to] Expedite Appeal."

7

¶14. On appeal is the trial court's granting of Brasfield & Gorrie's motion to compel arbitration and stay litigation arising from McInnis's original complaint, addressed here in a two-part analysis. First, whether the parties entered into an agreement which requires arbitration, and, second, whether the claims raised by Mcinnis may be compelled under the arbitration agreement.

## STANDARD OF REVIEW

¶15. The Mississippi Supreme Court applies "a de novo standard of review to denials of motions to compel" arbitration. *Covenant Health & Rehab. of Picayune, LP v. Est. of Moulds ex rel. Braddock*, 14 So. 3d 695, 701 (¶ 18) (Miss. 2009) (internal quotation marks omitted) (quoting *Covenant Health Rehab of Picayune, L.P. v. Brown*, 949 So. 2d 732, 736 (¶ 8) (Miss. 2007), *overruled on other grounds by Est. of Moulds*, 14 So. 3d at 702 (¶ 20)). "In reviewing an appeal of an order compelling arbitration, we review the trial judge's factual findings under an abuse-of-discretion standard[.]" *Virgil v. Sw. Miss. Elec. Power Ass'n*, 296 So. 3d 53, 59 (¶ 11) (Miss. 2020) (internal quotation mark omitted) (quoting *Smith v. Express Check Advance of Miss., LLC*, 153 So. 3d 601, 605-06 (¶ 8) (Miss. 2014)).

## DISCUSSION

¶16. In analyzing cases in which our court would compel arbitration under the Federal Arbitration Act, as is the case here, we proceed under a two-prong analysis as established in *Scruggs v. Wyatt*, 60 So. 3d 758 (Miss. 2011). Pursuant to the test, we must determine the following: "first, whether the parties intended to arbitrate the dispute, and second, if they did

8

intend to arbitrate, 'whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims.'" **Scruggs**, 60 So. 3d at 766 (¶ 17).

> I.    *Whether the parties entered into a binding arbitration agreement.*

¶17.    The United States Supreme Court has held that "[A] gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide." **Howsam v. Dean Witter Reynolds, Inc.**, 537 U.S. 79, 84 (2002). In determining the validity of an arbitration agreement, we look to the parties' intentions. **Pedigo v. Robertson**, 237 So. 3d 1263, 1267 (¶ 13) (Miss. 2017) (citing **Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.**, 473 U.S. 614, 626 (1985)). Here, it is clear that the subcontract binding McInnis and Brasfield & Gorrie is governed by the Federal Arbitration Act and arbitration in general. The agreement is clearly marked by article 29, which has a heading written in all caps and bold font that states "CLAIMS AND DISPUTES; ARBITRATION[.]" Mcinnis's own complaint states that the subcontract is "a binding contractual agreement."

¶18.    Thus, we hold that the parties entered into a binding arbitration agreement as evidenced by their intentions. The terms must now be analyzed for arbitrability.

> II.    *Whether claims raised by McInnis may be compelled under the arbitration agreement.*

¶19.    McInnis contends that even if the agreement between it and Brasfield & Gorrie is binding and does compel arbitration, the scope of the claims it raises falls outside of the

ambit of arbitration. We hold, however, that the scope of arbitration covers all claims, including those brought by McInnis.

¶20. Persuasive case law indicates that parties to an agreement to arbitrate are free to delegate scope questions to arbitrators and "stipulating that the [American Arbitration Association] Rules will govern the arbitration of disputes constitutes such 'clear and unmistakable' evidence" of an intent to delegate. *Arnold v. Homeaway Inc.*, 890 F.3d 546, 552 (5th Cir. 2018) (quoting *Petrofac, Inc. v.Dyn-McDermott Petroleum Operations Co.*, 687 F.3d 671, 674-75 (5th Cir. 2012)). In *Nethery v. CapitalSouth Partners Fund II, L.P.*, 257 So. 3d 270, 273 (¶ 17) (Miss. 2018), we favorably cited a Delaware case, *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76 (Del. 2006). The *Willie Gary* Court wrote, "As a matter of policy, we adopt the majority federal view that reference to the [American Arbitration Associartion] rules evidences a clear and unmistakable intent to submit arbitrability issues to an arbitrator." *Willie Gary, LLC*, 906 A.2d at 80. Here, reference to the invocation of the rules of the American Arbitration Association is undisputed.

¶21. McInnis and Brasfield & Gorrie agreed that disputes would be determined "in accordance with the current Construction Industry Rules of the American Arbitration Association by one or more arbitrators selected in accordance with said Rules." There, American Arbitration Association rules[3] expressly "state that arbitrators have power to rule

---

[3]American Arbitration Association, *Construction Industry Arbitration Rules and Mediation Procedures* (effective July 1, 2015), https://www.adr.org/sites/default/files/Construction_Rules_Web.pdf.

on questions of arbitrability[.]" ***Green Tree Servicing, L.L.C. v. House***, 890 F.3d 493, 503 (5th Cir. 2018).

¶22. When both parties agreed to terms that expressly invoked the rules of the American Arbitration Association, they manifested their intent to be bound by such rules and the assignment of the scope of arbitrability as determined under the group's rules. Agreeing to the American Arbitration Association rules is tantamount to agreeing to delegate scope questions to the arbitrators. ***Arnold***, 890 F.3d at 551- 52 (citing ***First Options of Chicago, Inc. v. Kaplan***, 514 U.S. 938, 944 (1995)). As to scope, we have held that it is well established that parties may agree on the scope of arbitration in any way they desire. ***B.C. Rogers Poultry, Inc. v. Wedgeworth***, 911 So. 2d 483, 491 (¶ 24) (Miss. 2005). Once that scope is delegated, the Federal Arbitration Act and United States Supreme Court interpretive decisions are "controlling law on the subject," even in state courts. ***MS Credit Ctr., Inc. v. Horton***, 926 So. 2d 167, 173 (¶ 14) (Miss. 2006).

¶23. Because both parties entered into an arbitration agreement with specific terms invoking the rules of the American Arbitration Association and because it is within the specific bailiwick of that association to determine arbitrability, we affirm the trial court's decision to compel arbitration.

¶24. **AFFIRMED.**

**MAXWELL, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR. KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J. RANDOLPH, C.J., NOT PARTICIPATING.**

11

**KITCHENS, PRESIDING JUSTICE, DISSENTING:**

¶25.    Respectfully, I dissent. I disagree with the majority's holding that the arbitrability of the claims of McInnis Electric Co. (McInnis) should be determined by the arbitrator. *See* Maj. Op. ¶ 21. Our courts have the prerogative to determine the scope of an arbitration agreement unless the parties clearly and unmistakably contract otherwise, which they did not do here. Further, parties are bound to arbitrate only those matters they intended to be bound to arbitrate. Here, the unforeseen and unavoidable impact of the COVID-19 pandemic on the parties' ability to perform a construction contract was not within the contemplated scope of the arbitration agreement—an agreement that did not contain a *force majeure* clause. Therefore, I would hold that the trial court erred by granting the defendant's motion to compel arbitration.

> **I.    The default question of arbitrability lies with the courts; here, the parties did not clearly and unmistakably contract to have the scope of arbitration determined by the arbitrator.**

¶26.    The "presumption in favor of arbitration does not apply to the question of who should decide arbitrability[.]" ***Greater Canton Ford Mercury, Inc. v. Ables***, 948 So. 2d 417, 422 (Miss. 2007) (quoting ***First Options of Chicago, Inc. v. Kaplan***, 415 U.S. 938, 945, 115 S. Ct. 1920, 131 L. Ed. 2d (1995)). This Court has acknowledged that "the general practice of allowing courts to determine the issue of arbitrability is super[s]eded by the contractual terms of an arbitration provision which provide that arbitrability will be decided by an arbitrator." *Id.* However, "[w]hether a party is bound by an arbitration agreement is generally considered

12

an issue for the courts, not the arbitrator, '*[u]nless the parties clearly and unmistakably provide otherwise.*'" *Id.* at 422 (second alteration in original) (quoting ***AT & T Techs. v. Commc'ns Workers of Am.***, 475 U.S. 643, 649, 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986)).

¶27.    Applying this test, the Court found in ***Greater Canton*** that the parties did clearly and unmistakably intend to place interpretation of the agreement with the arbtitrator when the arbitration provision stated that arbitrable "claims include, but are not limited to the following: . . . (2) *claims regarding the interpretation, scope or validity of this clause or arbitrabiltiy of any issue . . . .*" ***Id.*** (second alteration in original).

¶28.    But here, the arbitration agreement between McInnis and Brasfield & Gorrie (B & G) is devoid of any clear and unmistakable provision. While the agreement places arbitrable claims under the rules of the American Arbitration Association (AAA), general application of the Federal Arbitration Act (FAA) does not obviate the courts' authority to determine the threshold question of arbitrability because "the purpose of the FAA was to make arbitration agreements as enforceable as other contracts, not more so[.]" ***Id.*** at 421 (quoting ***Kaplan***, 514 U.S. at 945). Like multiple other courts and consistent with our current precedent, we should apply a presumption favoring judicial determination of arbitrability. *See **Jody James Farms, JV v. Altman Grp, Inc.***, 547 S.W.3d. 624, 632 (Tex. 2018). In ***Jody James Farms***, the Texas Supreme Court held:

> Texas courts differ about whether an arbitration agreement's mere incorporation of the AAA rules shows clear intent to arbitrate arbitrability. We hold it does not. Even when the party resisting arbitration is a signatory to an

13

arbitration agreement, questions related to the existence of an arbitration agreement with a non-signatory are for the court, not the arbitrator.

*Id.* Mere "incorporation by reference of rules giving an arbitrator power to rule on his own jurisdiction" is not enough "to show that the parties clearly and unmistakably agreed to arbitrate arbitrability." ***Mem'l Hermann Health Sys. v. Blue Cross Blue Shield of Tex.***, No. H-17-2661, 2017 WL 5593523, at *8 (S.D. Tex. Nov. 17, 2017).

¶29.     I agree with McInnis's argument that the agreement's reference to the arbitration rules "is directed solely to the terms of the contract, and as such, maintains the power of the court to determine the question of arbitrability." The United States District Court for the Southern District of Mississippi analyzed an arbitration agreement similar to the one at hand and determined that the contract language did not clearly and unmistakably place arbitrability under the purview of the arbitrator. That court's helpful analysis was as follows:

> In the Court's opinion, the contract does not unmistakably provide that the arbitrator must determine the scope of the arbitration provision. The pertinent sentence is: "Any and all disputes in connection with or arising out of the Provider Agreement will be exclusively settled by arbitrator in accordance with the Rules of the American Arbitration Association." Defendants focus on the phrase "in accordance with the Rules of the American Arbitration Association," but that phrase modifies "[a]ny and all disputes in connection with or arising out of the Provider Agreement." In other words, the contract first gives the arbitrator jurisdiction over "disputes in connection with or arising out of the Provider Agreement," and then it provides that the arbitrator will settle those disputes in accordance with the AAA Rules. Accordingly, the Court must determine whether the present dispute is "in connection with" or "aris[es] out of the Provider Agreement."

*Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, No. 2:12-CV-114-KS-MTP, 2012 WL 12863150 at * 15 (S.D. Miss. Oct. 24, 2012) (alterations in original).[4]

¶30.    As this Court has established, the presumption favoring arbitration does not apply to the stage of determining arbitrability. *Greater Canton*, 948 So. 2d at 422. Applying the applicable presumption favoring judicial determination, I would find that the trial court erred by ordering that "all procedural issues related to the scope of the agreement shall be determined by the Arbitrator[.]" Mere incorporation by reference to AAA rules permitting an arbitrator to determine the scope of an arbitration agreement is not sufficient to establish a clear and unmistakable intent to deprive the courts of the prerogative to determine whether an arbitration agreement is enforceable with respect to the claims at hand.

**II.      The scope of the parties' arbitration agreement did not contemplate the impact of the COVID-19 pandemic.**

¶31.    With the question of arbitrability where it belongs—with our courts—I would find that the contract did not contemplate the impact of the COVID-19 pandemic on the parties ability to perform the construction contract. This position is consistent with our long-standing precedent that "[a]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Keyes v. Dollar Gen. Corp.*,

---

[4] In *Mississippi State Port Authority at Gulfport v. Southern Industrial Contractors LLC*, 271 So. 3d 742, 746 (Miss. Ct. App. 2013), our Court of Appeals reversed the trial court's grant of the defendant's motion to compel arbitration when the agreement contemplated terminating a contract by arbitration, negotiation, or litigation, similar to the provisions at issue here. Presiding in that case was the same circuit judge as in the instant case.

240 So. 3d 373, 376–77 (Miss. 2018) (internal quotation marks omitted) (quoting ***Rogers-Dabbs Chevrolet-Hummer, Inc. v. Blakeney***, 950 So. 2d 170, 176 (Miss. 2007)). "[T]he parties' intentions control." ***Pedigo v. Robertson***, 237 So. 3d 1263, 1267 (Miss. 2017) (citing ***Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.***, 473 U.S. 614, 626, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985)) "[E]ven broad clauses have their limits." ***Doe v. Hallmark Partners, LP***, 227 So. 3d 1052, 1054 (Miss. 2017) (internal quotation mark omitted) (quoting ***Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.***, 139 F.3d 1061, 1067 n.8 (5th Cir. 1998).

¶32.    When asking whether the parties' dispute is within the scope of an arbitration agreement pursuant to the FAA, "the United States Supreme Court has stated the question is 'whether legal constraints external to the parties' agreement foreclosed arbitration of those claims.'" ***E. Ford, Inc., v. Taylor***, 826 So. 2d 709, 713 (Miss. 2002) (quoting ***Mitsubishi Motors Corp.***, 473 U.S. at 626). This "includes the consideration of applicable contract defenses available under state contract law which may invalidate the arbitration agreement." ***Sanderson Farms, Inc. v. Gatlin***, 848 So. 2d 828, 834 (Miss. 2003) (citing ***Taylor***, 826 So. 2d at 713). Defenses such as impossibility are highly relevant to this case. *See **Hendrick v. Green***, 618 So. 2d 76 (Miss. 1993).[5]

¶33.    Common sense supports a finding that the unforseen crisis of the pandemic is outside the contemplated scope of the agreement's arbitration clause. The sudden loss of 40 percent

---

[5] This is especially—though I would suggest not dispositively—true given the absence of a *force majeure* provision in the parties' contract.

16

of a workforce (among other serious difficulties) due to widespread illness is not a normal situation. The parties faced external constraints related to the necessity of and responsibility for implementing health safety measures, including the observance of quarantine policies for sick workers.

¶34. Whether McInnis can succeed on the argument that the impact of COVID-19 was a defense to contract performance is a question to be litigated in the trial court. Where, as here, a natural force as novel and disruptive as COVID-19 emerges, the development of the common law should occur in our courts. I agree with McInnis's argument that "[d]etermination of the applicability of the COVID-19 pandemic to *force majeure* [precedents], as well as whether *force majeure* conditions are contractually contemplated within an arbitration provision in the absence of an express provision, are both novel issues of first impression best suited for development through Mississippi common law, not guessed at by arbitrators."

¶35. Therefore, I dissent.

**KING, P.J., JOINS THIS OPINION.**