[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 20-10646
Non-Argument Calendar
_____

D.C. Docket No. 1:19-cv-00112-CG-N


GEORGIA-PACIFIC CONSUMER OPERATIONS, LLC,

Plaintiff -
Counter Defendant -
Appellee,

versus

UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE
WORKERS UNION, LOCAL 9-0952,

Defendant -
Counter Claimant -
Appellant,

ROGER IRVIN,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama
_____

(November 20, 2020)

Before JORDAN, NEWSOM, and LAGOA, Circuit Judges.

PER CURIAM:

This appeal arises out of the arbitration of a dispute between Georgia-Pacific Consumer Operations, LLC, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers Union, Local 9-0952. The Union represents a subset of employees at one of Georgia-Pacific's plants, and Roger Irvin was one such employee before he was terminated after a positive drug test. The Union and Georgia-Pacific have a collective-bargaining agreement that allows for arbitration of matters like this. Here, the arbitrator determined that under the parties' contract, Georgia-Pacific lacked just cause to terminate Irvin. Irvin's failed drug test, he found, was the result of an accident—after waking up sick one morning, he took his wife's cough syrup (with codeine) rather than his own (without codeine). The arbitrator thus ordered Georgia-Pacific to reinstate Irvin and make him whole for all of the time he missed save for a 90-day suspension.

The district court vacated the arbitrator's decision, reasoning that he had exceeded his authority under the contract between the Union and Georgia-Pacific. The district court separately refused to dismiss Irvin from the action. The Union and Irvin appealed. We affirm on the second issue but reverse and remand on the first.

## I

Georgia-Pacific runs a pulp and paper plant in Pennington, Alabama. The Union represents the facility's production and maintenance employees, including Irvin. Georgia-Pacific and the Union have a collective-bargaining agreement that provides, *inter alia*, for arbitration of disputes if negotiations fail. One such arbitration ensued after Georgia-Pacific terminated Irvin for failing a random drug test and internal grievance procedures failed to settle the matter.

The arbitrator agreed with the Union. He said the contract between the Union and Georgia-Pacific required "just cause" to fire an employee under these circumstances, and he determined that no such just cause was present. The arbitrator first summarized the parties' arguments and then laid out a couple of key provisions of the contract that informed his analysis. The first, Article 8, addressed Georgia-Pacific's "Rights of Management" and explained that Georgia-Pacific had "the right to promote, suspend, demote, transfer or relieve employees from duty because of lack of work or other just cause, discipline and discharge employees for

3

just cause and establish and enforce reasonable safety and work rules." The next key provision, Article 24, addressed the company's drug and alcohol policy. First, Article 24 laid out a drug-testing program for instances where Georgia-Pacific had "reasonable cause to believe that an employee is under the influence of alcohol or a controlled substance" and stated that "[i]f the employee refuses to take the test or, having taken the test registers a positive finding[,] the employee shall be subject to immediate discharge." Article 24 also outlined a "a 'zero tolerance' random drug testing program" that Georgia-Pacific said it would establish in the future. And it stated that among the "[e]lements of the plan," one would be "[d]ischarge for a positive test result."[1]

In summarizing the facts, the arbitrator explained that the morning before his random drug test, Irvin had woken up with a bad cough and taken a swig of cough syrup. But he had the wrong bottle—rather than taking his bottle of non-prescription cough syrup out of the medicine cabinet, Irvin had gotten a hold of his wife's prescription cough syrup. The Union had argued that the two bottles looked very similar, and the arbitrator reasoned that mistaking one for the other was an innocent mistake. And, the arbitrator observed, Irvin was only tested on the day in question because he and another employee had agreed to serve as each other's

---

[1] Georgia-Pacific eventually established just such a plan. Notably, it provided for termination in the event of a positive test result unless "otherwise prohibited by a collective bargaining agreement."

testing witnesses so as to not delay the drug test. (The usual witness, the plant guard, wasn't around at the time.) The arbitrator determined that the contract required "just cause" for termination and that Irvin's innocent conduct made it impossible to say Georgia-Pacific had just cause to fire him. Yet, because the Contract embraced both the "just cause" standard and announced a "zero tolerance" random drug-testing program, the arbitrator determined that some discipline was required. Accordingly, he ordered Georgia-Pacific to return Irvin to work and make him whole for the time lost due to termination, except for a 90-day suspension period.

Georgia-Pacific turned to the district court for relief. Georgia-Pacific argued that the arbitrator's decision should be vacated because he had unlawfully modified the contract. The district court agreed.[2] Carefully parsing the language of the contract and the nuances of our circuit precedent, the court concluded that the just-cause standard was satisfied because, on its analysis, the contract's language allowed Georgia-Pacific to fire any employee who failed a drug test. So, the district court reasoned, once the arbitrator determined that Irvin had indeed failed a drug test, he had no authority to determine that no just cause for termination existed. That the arbitrator did so anyway meant that the arbitrator had exceeded

_____

[2] The district court referred the matter to a magistrate judge, and eventually adopted the magistrate judge's report and recommendation as its opinion and entered judgment consistent with it.

his authority under the contract, and so his decision had to be vacated. Separately, the district court denied Irvin's request to be dismissed from the action, finding that he was a proper party under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, under the Supreme Court's decision in *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554 (1976).

The Union and Irvin appealed.

## II

"[O]rders vacating arbitration awards, like orders confirming them, are to be reviewed for clear error with respect to factual findings and *de novo* with respect to the district court's legal conclusions." *Gianelli Money Purchase Plan & Tr. v. ADM Inv. Servs., Inc.*, 146 F.3d 1309, 1311 (11th Cir. 1998). "[C]ourts may vacate an arbitrator's decision 'only in very unusual circumstances.'" *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 568 (2013) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995)).

## A

"A federal court's review of an arbitration award is extremely 'narrow.'" *IMC-Agrico Co. v. Int'l Chem. Workers Council of United Food & Com. Workers Union, AFL-CIO*, 171 F.3d 1322, 1325 (11th Cir. 1999) (quoting *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)). "Because the parties have contracted to have disputes settled by an arbitrator

chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 37–38 (1987). The Supreme Court has emphasized that limited review of arbitral decisions "maintain[s] arbitration's essential virtue of resolving disputes straightaway." *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 588 (2008). So, although an arbitrator "may not ignore the plain language of the contract," a court "should not reject an award on the ground that the arbitrator misread the contract." *Misco*, 484 U.S. at 38. The question we face "is not whether the arbitrator construed the parties' contract correctly, but whether he construed it at all." *Sutter*, 569 U.S. at 573. If he "arguably" did so, then his "construction holds, however good, bad, or ugly." *Id.* at 572–73.

We hold that the arbitrator "arguably" interpreted the contract here and, accordingly, that his decision should not have been vacated. Reviewing the arbitrator's decision and the district court's analysis of it shows that, whether rightly or wrongly, the arbitrator grappled with the text of the contract. Though he understood the portion concerning discharge for positive results differently than the district court did, the arbitrator didn't ignore or modify that language.

At the outset of his decision, the arbitrator framed the dispute as one "regarding the exercise by [Georgia-Pacific] of its contractual authority to

7

discharge an employee who tested positive on a random drug test."  And in his discussion of the issues, he posed the arbitration's central question this way: "Does the Contract require the company to demonstrate just cause in order to terminate an employee who has tested positive for opiates during a random drug screen?"  Turning to Georgia-Pacific's position, he distilled it as "[Irvin's] positive test is the required evidence of just cause."  Then, the arbitrator characterized the part of the contract concerning Georgia-Pacific's the random drug-testing program as a "commitment" and asked whether Georgia-Pacific's interpretation of the policy made to fulfil that commitment was "under the Parties' contract, . . . enforceable with regard to [Irvin] and . . . his circumstances?"

The arbitrator's answer was no.  Whether that's right or wrong doesn't matter for our purposes—all that matters is that the arbitrator's answer flowed from his interpretation of the contract.  The arbitrator emphasized that another provision of the contract limited Georgia-Pacific's power "to discipline and discharge employees to just cause."  He then explained why he couldn't conclude that "just cause" existed under these circumstances.  If his efforts had simply been free-wheeling policymaking, then vacatur would have been justified.  But they weren't, and so it wasn't.

Much of the district court's analysis reinforces the same conclusion.  The district court led off its analysis by stating that "[t]he Arbitrator based his decision

8

on the interplay of provisions in Articles 8 and 24 of the Contract."  That's right, and it shows that the arbitrator's decision was an exegetical one.  So does the district court's summary of the arbitrator's analysis on the "zero tolerance" policy: "[I]nterpreting Article 8, Section 2 as 'limiting Management's right to discipline and discharge employees to just cause,' the Arbitrator rejected Georgia-Pacific's position, instead appearing to accept the Union's argument that Georgia-Pacific 'must synchronize the just cause standard in the Contract with the Zero Tolerance of the drug policy.'"  Again, that's right.  As the district court recognized, the arbitrator interpreted the contract as a whole and attempted to synthesize the provisions that were (perhaps) in tension.  That answers "the sole question for us"—specifically, "whether the arbitrator (even arguably) interpreted the parties' contract." *Sutter*, 569 U.S. at 569.  When that happens, the arbitrator's decision should be affirmed.

The district court reached the opposite conclusion based on our decision in *Warrior & Gulf Nav. Co. v. United Steelworkers of Am., AFL-CIO-CLC*, 996 F.2d 279 (11th Cir. 1993).  *Warrior & Gulf* also involved an employee who was terminated for violating a drug-testing policy. *Id.* at 279–80.  There, the contract between the employer and the union included the specific terms of the drug-testing policy: "In the event a positive result is obtained in a test administered to an employee who has been suspended without pay pursuant to [another provision of

9

the contract], the employee is subject to immediate discharge." *Id.* at 280 n.4. The arbitrator in that case found that the employee had previously been suspended without pay, as required by the contract, but determined that the contract's "just cause" provision didn't allow for termination without "'just and equitable' procedures." *Id.* at 280. Because the arbitrator felt those were lacking in that instance, he reduced the discipline imposed from discharge to a suspension. *Id.*

The district court vacated that decision, and we affirmed. *Id.* at 279. That was because the contract there said "that an employee who tests positive a second time is 'subject to immediate discharge,'" and because that "express language g[ave] management the complete discretion to fire an employee." *Id.* at 281. So, once the arbitrator determined that the employee had tested positive a second time, the contract's express terms required the arbitrator to affirm the company's decision to fire the employee. *Id.* And the contract's "just cause" provision was satisfied because the contract "expressly address[ed] the particular contingency of a second positive drug test." *Id.* There was no need to synthesize the two provisions, nor any license to modify them. Instead, we reaffirmed "the principle that arbitrators must follow the express terms of collective bargaining agreements." *Id.* at 281 n.4.

In this case, the district court said that just as the contract in *Warrior & Gulf* provided management with the discretion to fire any employee with a second

positive test, so this contract expressly gave Georgia-Pacific the discretion to fire Irvin. And, as in *Warrior & Gulf*, because the contract provided for termination in the event of a positive test, that necessarily satisfied the just-cause standard. The district court based that reasoning on Article 24 of the contract, which said that one of the elements of the future drug-testing policy would be "[d]ischarge for a positive test result." So, on the district court's understanding, as soon as the arbitrator found that Irvin had indeed tested positive, the arbitrator could do nothing but affirm his termination without ignoring the express language of the contract. It was *Warrior & Gulf* all over again.

But we see daylight between *Warrior & Gulf* and this case. That contract included the express (and apparently complete) terms of the drug-testing policy, spelling out each provision in some detail. *See Warrior & Gulf*, 996 F.2d at 279–80 nn. 1–4 (quoting provisions of drug-testing policy contained in contract). In other words, the contract included the specifics of the policy. Here, by contrast, the language in the contract is more skeletal. The parties agreed to create a random drug-testing plan, listed "elements" of that plan that would apply, and included among those elements "[d]ischarge for a positive test result." That, though, is not a contract that clearly and expressly gave management unfettered discretion to fire any employee with a positive result—it's a contract that spelled out some general terms and punted on particulars until a fleshed-out policy could be crafted.

11

That is a difference in both kind and degree.  As to kind, *Warrior & Gulf* involved a fully realized drug-testing policy that was written into the contract. Here, we have only a promise to promulgate a random drug-testing policy in the future and some preliminary pieces of that plan's framework.  And as to degree, the language in *Warrior & Gulf* was much more particularized.  The *Warrior & Gulf* Court emphasized that the contract there "expressly addresse[d] the particular contingency of a second positive drug test."  996 F.2d at 281.  The language in this contract is much less specific, as one might expect for an "element" of a plan that the parties agree will be implemented later.  Indeed, if construed in a vacuum, the "[d]ischarge for a positive test result" element here would seem to *require* discharge for any and all positive test results.  But we don't construe that language in a vacuum—we know from the rest of the contract that it was only an element of a drug-testing policy that Georgia-Pacific promised to complete later.  And we know that under that policy, *not* every "positive test result" led inexorably to termination.  For instance, the drug-testing policy allowed for the cancellation of flawed tests and for employee challenges of positive results through retesting. That policy also explained that an employee with an initial "positive" result can get that result changed to "negative" if he provides a valid prescription for medicine that could have caused the positive result.  That the parties didn't understand this element of the random drug-testing plan to require termination for every "positive

12

result" also suggests that in this case, unlike in *Warrior & Gulf*, some interpretation was required to synthesize the "just cause" provision with the random drug-testing plan.

Focusing on the part of the contract just before the outline of the random drug-testing policy reinforces the same conclusion. In contrast to the random drug-testing plan, the portion of the contract that addressed instances where Georgia-Pacific "has reasonable cause to believe that an employee is under the influence of alcohol or a controlled substance" expressly and specifically provided for when employees would be "subject to immediate discharge." One provision within the "reasonable cause" drug-testing plan even said that if an employee refuses to take a test, "reasonable cause shall automatically exist to believe that the employee was under the influence and just cause shall exist for immediate discharge." Those provisions demonstrate that the parties knew how to bargain for clear, specific language that synthesized Article 24's drug-testing plans with Article 8's "just cause" standard. And they show that the parties didn't do that in laying out bare elements of a random drug-testing policy. That decision left room for interpretation of the contract, and the parties committed those interpretive questions to the arbitrator. Because "[i]t is the arbitrator's construction which was bargained for," *Enter. Wheel & Car Corp.*, 363 U.S. at 599, the "arbitrator's construction holds, however good, bad, or ugly." *Sutter*, 569 U.S. at 573.

13

**B**

Next, we consider the district court's denial of Irvin's request to be dismissed from the case. As the district court noted, the Supreme Court has said that "Section 301 contemplates suits by *and against* individual employees as well as between unions and employers." *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 562 (1976) (emphasis added). On that basis, it denied Irvin's request to be dismissed from this action.

The Union says *Hines* doesn't apply here because it only addressed a very limited exception to the general rule that employees aren't proper parties to suits between unions and employers. That exception, according to the Union, only allows employees to sue employers when the Union has failed in its duty of "fair representation." *See Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 131 (4th Cir. 2002). As the Union rightly notes, there's no claim that the Union failed in its duty of fair representation.

But that does not allow us to ignore *Hines*. And the Union's argument makes no sense of the language in *Hines* concerning suits "against" employees. *See* 424 U.S. at 562. What's more, the Supreme Court has reaffirmed that language from *Hines*. *See Groves v. Ring Screw Works, Ferndale Fastener Div.*, 498 U.S. 168, 172 (1990) ("We have squarely held that § 301 authorizes 'suits by and against individual employees as well as between unions and employers.'"

14

(quoting *Hines*, 424 U.S. at 562)).  As a result, we cannot fault the district court for denying Irvin's request for dismissal here.

\*       \*       \*

We reverse the district court's judgment on the arbitration award and remand for further proceedings consistent with this opinion, and we affirm the district court's judgment on Irvin's request for dismissal.

**REVERSED IN PART, REMANDED IN PART, AND AFFIRMED IN PART.**