

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| ANADARKO PETROLEUM CORPORATION and ANADARKO E&P ONSHORE LLC | § | No. 08-24-00059-CV |
| | § | Appeal from the |
| Appellants, | § | 143rd Judicial District Court |
| v. | § | of Reeves County, Texas |
| CHEVRON U.S.A. INC. and CHEVRON ADVANTAGE INC. | § | (TC#23-10-24972-CVR) |
| Appellees. | | |

## MEMORANDUM OPINION

Appellees Chevron U.S.A. Inc. and Chevron Advantage Inc. (collectively, Chevron) filed a lawsuit against Appellants Anadarko Petroleum Corporation and Anadarko E&P Onshore LLC (collectively, Anadarko) claiming Anadarko had been erroneously calculating the royalty interests owed to Chevron under various lease agreements. Anadarko denied Chevron's allegations and filed a motion to compel arbitration, contending the leases were entered into pursuant to a Mineral Farmout Agreement, which contained an arbitration agreement that delegated the issue of arbitrability to the arbitrator. The trial court denied the motion. This interlocutory appeal ensued.

Concluding that the parties clearly and unmistakably delegated to the AAA arbitrator the issue of arbitrability—i.e., whether the contracts require the parties to resolve their dispute through

arbitration—and without opining on the same or on the merits of the parties' dispute, we reverse the trial court's order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The mineral farmout agreement

Chevron and Anadarko both owned fee mineral interests and oil and gas leases in several West Texas counties. In July 2006, Chevron and Anadarko entered into a Mineral Farmout Agreement (the MFA) designating a "Contract Area" within which Anadarko could lease any of Chevron's fee mineral interests not yet under lease and obtain assignments of Chevron's existing leases. The stated purpose of the MFA was to give Anadarko the right to "earn oil and gas leases covering the Chevron Minerals and other Chevron Contract Lands"; in exchange, Chevron had the "right to receive royalties and other payments and benefits." Anadarko agreed to pay Chevron $4,500,000 as initial consideration to execute the MFA and have the options to earn interests as provided for in the MFA. The MFA's term was for 12 years from its effective date (July 5, 2006), subject to earlier termination provisions.[1]

The MFA split the designated Contract Area into three priority areas and gave Anadarko the right to designate a "prospect area" of a certain size within any of the priority areas that it wished to lease to drill an exploratory well. Under the MFA, Chevron would have ten days after receiving written notice of Anadarko's designation of a prospect area to execute and deliver an "oil and gas lease or term assignment under the [specified] terms." The MFA required Anadarko to designate at least two prospect areas within the first year of the term and commence drilling a well within 90 days after Chevron issued its lease.

---

[1] The parties agree that the MFA terminated in 2015.

The MFA expressly incorporated by reference numerous exhibits, including Contract Area maps, lists of Chevron's and Anadarko's existing leases in the area, geophysical survey permits, a lease form, an assignment form, and the arbitration agreement at issue.

### (1) The leases of Chevron's mineral interests

The MFA provided that, in exchange for leasing a prospect area, Anadarko agreed to give Chevron: (1) a bonus per mineral acre depending on the priority area; (2) a reserved royalty of 25%; (3) a primary term of three years; and (4) an option to extend if drilling was timely commenced and an additional bonus amount was paid. The parties were to use the lease form attached to the MFA and incorporated as Exhibit E "covering all of Chevron's right, title and interest in all fee mineral interest."

Exhibit E explained in more depth how Chevron's 25% reserved royalty interest was to be calculated, specifying, in part, that the

> [r]oyalties on leased substances to be paid by [Anadarko to Chevron] are (a) on oil and liquid petroleum products recovered at the well, twenty five percent (25%) of the market value at the well of the oil and liquid petroleum products recovered at the well; (b) on gas, including casinghead gas, produced from the Land and sold or used off the premises, twenty five percent (25%) of the market value of the gas at the well, plus the market value of the products recovered when such gas is processed.

The parties acknowledge that Exhibit E did not contain any dispute resolution provisions.

It is undisputed that, during the term of the MFA, Chevron USA entered into several "nearly identical" leases with Anadarko, using the Exhibit E lease form. The MFA is referenced multiple times in the executed lease in the record before us.[2] The parties also agree that Chevron USA assigned its interest in some of those leases to Appellee Chevron Advantage, Inc.

---

[2] Paragraph Three provides, in part:

### (2) The term assignments of Chevron's existing leases

As set forth above, the MFA also provided for term assignments of leases owned by Chevron in the Contract Area. In exchange for the assignments, Anadarko agreed to pay Chevron a bonus per net mineral area depending on the priority area. The parties agreed to use the assignment form in Exhibit O for all such assignments. Exhibit O contained the following dispute resolution provision: "The Parties agree that if any dispute arises between them related to this Assignment they will use the procedures outlined in Exhibit '2', attached hereto, to attempt to resolve such dispute." Exhibit 2 to Exhibit O provided that if the parties were unable to resolve their disputes through negotiation or mediation, they agreed to submit their dispute to binding arbitration to "in accordance with the AAA's Commercial Arbitration Rules (the 'Rules') effective at the time of the dispute."

---

Notwithstanding anything contained herein to the contrary, but subject to Article 5.1 (b) of the [MFA] (hereinafter defined), Lessor may at any time, or from time to time, upon not less than 90 (ninety) days written notice to Lessee, elect to take its royalties accruing to such royalty owner under this lease in land; provided that any expense incident to the exercise of such election shall be borne by Lessor and such election shall be for periods of not less than 12 (twelve) months.

Paragraph 16 provides, in part:

Subject to the terms and provisions of that certain Mineral Farmout Agreement, TXL Minerals Area, Culberson, Loving, Reeves and Ward Counties, Texas, dated effective July 5, 2006, by and between Lessor and Lessee (the '[MFA']), Lessor hereby grants Lessee the option to extend the primary term of this lease for an additional two (2) years from the expiration of the original primary term hereof as to all or any portion of the Land then held hereunder which would expire unless so extended. If allowed by the [MFA], this option may be exercised by Lessee, or its successors and assigns, at any time before the expiration of the primary term hereof by paying or crediting to Lessor the sum described in the [MFA] per net mineral acre for each acre so extended, which payment or credit shall cover the two (2) years of the extended term, and Lessor acknowledges that there will be no other payments or credits due for or during the extended term (with the exception of shut-in gas well payments or credits allowed for under this Lease). Payment shall be made or credit given in accordance with Article 5.1 of the [MFA].

4

### (3)    The transfer period and Chevron's right to audit Anadarko's records

The MFA provided for a "Transfer Period" in which Anadarko was to retain the various payments it owed Chevron under the leases and assignments until September 1, 2018, or until the payments owed totaled one hundred million dollars. These payments included all "royalties (as provided in the lease form attached hereto as Exhibit E)"; "oil and gas lease bonus consideration"; "term assignment consideration"; and "oil and gas lease extension bonus." During the Transfer Period, Anadarko was to keep a record of the payments and provide Chevron with quarterly statements regarding its drilling operations and payments. Under the MFA, Chevron had the right to annually audit Anadarko's "accounts and records relating to its calculation of the Payment Statements pursuant to this Agreement and any agreements executed pursuant to this Agreement."

Anadarko was required to notify Chevron within 30 days after the payment amounts reached one hundred million dollars. When that amount was reached and/or when the Transfer Period otherwise expired, "all payments [were to] be paid to and owned by Chevron, effective on the first day of the calendar month during which termination of the Transfer Period occurs."

### (4)    The dispute resolution provisions in the MFA

The MFA contained the following dispute resolution provision:

> **16.11 Dispute Resolution.** For any disputes that may arise under this Agreement, the Parties agree to utilize the dispute resolution provisions found under Exhibit 'N' attached hereto to resolve any such disputes.

In turn, Exhibit N provided that disputes "arising out of or relating to the [MFA] . . . or the breach thereof" which could not be resolved through negotiation or mediation would go to binding arbitration through the AAA:

> Any dispute arising out of or relating to the Agreement shall be resolved by binding arbitration conducted in Houston, Texas, at a place agreed upon by the parties, or, lacking such agreement, at the Houston, Texas office of the American Arbitration Association ('AAA').

> If a dispute arises out of or relates to this Agreement, or the breach thereof, and if the dispute cannot be settled through negotiation, the Parties agree first to try to settle the dispute by mediation before resorting to arbitration. If the Parties are unable to resolve the dispute through mediation, the Parties agree to submit the dispute to arbitration within 30 days following the unsuccessful mediation.
>
> Unless otherwise agreed by the Parties, the arbitration shall be conducted in accordance with the AAA's Commercial Arbitration Rules (the 'Rules') effective at the time of the dispute.

Exhibit N specified that "[t]his arbitration provision shall survive the termination of this Agreement."

### B. Chevron's lawsuit

In October 2023, Chevron sued Anadarko in Reeves County, alleging Anadarko had been systemically underpaying royalties under the leases and it owed Chevron over one hundred million dollars.[3] At issue was the lease provision requiring Anadarko to calculate royalties "based on the market value of production at the well." According to Chevron, Anadarko had "consistently failed to pay Chevron based on the market value of oil and gas," in light of "comparable sales of like kind, character, and quality, at the times of production and sale." Chevron brought a claim for breach of contract and a claim for violation of a provision of the Texas Natural Resources Code, alleging Anadarko failed to properly "calculate and pay royalties on all volumes and proceeds attributable to each well/leases" within the statutory time periods.[4] Chevron specified in its

---

[3] The record contains a letter that Chevron sent to Occidental Petroleum Corporation (a company that acquired Anadarko), prior to filing suit, dated May 12, 2021, stating that it had conducted an audit of its records pertaining to the "net royalty and volumes of oil and gas associated with the subject property" to determine whether the "volumes, sales and deductions were in accordance with [the] mineral farmout agreement."

[4] Texas Natural Resources Code § 91.402 provides in part that "[t]he proceeds derived from the sale of oil or gas production from an oil or gas well located in this state must be paid to each payee by payor on or before 120 days after the end of the month of first sale of production from the well. After that time, payments must be made to each payee on a timely basis according to the frequency of payment specified in a lease or other written agreement between payee and payor." Tex. Nat. Res. Code Ann. § 91.402(a).

petition that its "claims in this suit solely arise under and are related to its royalty interest under the Leases, without reference to any other agreement(s) between the parties."

**C.  Anadarko's motion to compel arbitration**

Shortly thereafter, Anadarko initiated arbitration proceedings with the AAA and filed a motion to compel arbitration, citing MFA section 16.11 requiring dispute resolution to be conducted in accordance with Exhibit N's provisions. Because Exhibit N specified that disputes "arising out of or relating to" the MFA were to be resolved through binding arbitration in accordance with AAA's Commercial Arbitration Rules—which, as explained below, call for the arbitrator to decide issues of arbitrability—Anadarko argued that the AAA arbitrator, rather than the trial court, was required to decide arbitrability. In the alternative, Anadarko argued that even the court were to disregard the "delegation provision" in Exhibit N and decide arbitrability, it should find that Chevron's claims came within the scope of the MFA arbitration requirement, as the lease agreements were entered into pursuant to the MFA itself and would not exist but for the MFA. Anadarko attached one of the executed lease agreements, which, as described above, was drawn from the MFA's Exhibit E and contained multiple references to the MFA.

In response, Chevron acknowledged that Exhibit N contained an arbitration agreement with a delegation provision but argued it did not apply to the parties' dispute. According to Chevron, MFA section 16.11 limited Exhibit N's applicability. Section 16.11 provided that "[f]or any disputes that may arise under this Agreement, the Parties agree to utilize the dispute resolution provisions found under Exhibit 'N' attached hereto to resolve any such disputes." Chevron argued the parties' dispute did not "arise under" the MFA, and instead arose under the terms of the lease agreements, which set forth the manner in which Anadarko was to calculate its royalty interest.

7

And because the lease agreements, unlike the assignment agreements, did not contain an arbitration provision, Chevron argued, it could not be compelled to arbitrate.

### D. The trial court's ruling

The trial court held a hearing on December 7, 2023, and took the matter under advisement. At the parties' urging, the court agreed to stay discovery in both the trial court and arbitration proceedings until it ruled on Anadarko's motion. On March 7, 2024, the trial court denied Anadarko's motion to compel arbitration without specifying its reasons and granted Chevron's motion to continue the stay of the arbitration proceedings.[5] This interlocutory appeal followed.

## II. ISSUES ON APPEAL

In four related issues, Anadarko contends the trial court erred by denying its motion to compel arbitration. In Issue One, Anadarko maintains the MFA contained a valid and enforceable arbitration agreement that delegated arbitrability of claims to the arbitrator. In Issue Two, Anadarko argues that, even if this Court concludes it is required to determine the issue of arbitrability, we should conclude that Chevron's claims came within the scope of the MFA's arbitration agreement. In Issue Three, Anadarko contends Appellee Chevron Advantage, as an assignee to certain leases, is also subject to the arbitration provision despite being a non-signatory to the MFA.[6] In Issue Four, Anadarko urges us to reverse the trial court's order denying the motion to compel arbitration and granting Chevron's motion to stay arbitration.

---

[5] Because the trial court entered "March 6, 2023," on the signature line of its order, rather than March 6, 2024, Anadarko filed an unopposed motion to correct the order nunc pro tunc, which the trial court granted, reissuing the order with the correct date on it.

[6] In its brief, Chevron states that it "does not separately address the issue that Anadarko raises as to Chevron Advantage [because that] issue turns completely on the issue stated above," i.e., whether the "trial court properly den[ied] Anadarko's motion to compel arbitration." Chevron therefore appears to acknowledge that if Chevron USA is bound as a signatory to the agreement, so too is Chevron Advantage as its assignee. Accordingly, we do not reach Anadarko's Issue Three regarding whether Chevron Advantage is bound by the parties' arbitration agreement as a non-signatory to the MFA.

## III. STANDARD OF REVIEW

A trial court's order denying a motion to compel arbitration is reviewed for an abuse of discretion. *APC Home Health Servs*. *Inc. v. Martinez*, 600 S.W.3d at 389 (citing *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 642–43 (Tex. 2009) (orig. proceeding)). When a trial court improperly denies a party's right to arbitrate pursuant to a valid and enforceable arbitration agreement, the court has abused its discretion. *In re Odyssey Healthcare, Inc.*, 310 S.W.3d 419, 422 (Tex. 2010) (orig. proceeding) (citing *Halliburton Co.*, 80 S.W.3d 566, 573 (Tex. 2002)). The trial court's determination of whether an arbitration agreement is valid and enforceable is a legal question subject to de novo review. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003); *see also Baby Dolls Topless Saloons, Inc. v. Sotero*, 642 S.W.3d 583, 586 (Tex. 2022) (if one party resists arbitration, the trial court must determine whether a valid agreement to arbitrate exists, which is a question of law subject to de novo review). Courts determine whether an enforceable agreement to arbitrate exists by applying principles of state contract law. *See In re Halliburton Co.*, 80 S.W.3d at 568; *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 738 (Tex. 2005). An appellate court may uphold the trial court's decision on a motion to compel arbitration on any appropriate legal theory urged below. *APC Home Health Servs.*, 600 S.W.3d at 389.

## IV. APPLICABLE LAW

Arbitration is a contractual proceeding by which the parties, to obtain a speedy and inexpensive final disposition of disputed matters, consent to submit the controversy to an arbitrator for resolution. *See In re Phelps Dodge Magnet Wire Co.*, 225 S.W.3d 599, 605 (Tex. App.—El Paso 2005, no pet.) (citing *Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 268 (Tex. 1992)). Because arbitration is "a matter of consent, not coercion," parties cannot be compelled to arbitrate

any controversy unless they have contractually agreed to do so. *TotalEnergies E&P USA, Inc. v. MP Gulf of Mexico, LLC*, 667 S.W.3d 694, 701 (Tex. 2023) (citing *Robinson v. Home Owners Mgmt. Enters., Inc.*, 590 S.W.3d 518, 521 (Tex. 2019)).

In general, a party seeking to compel arbitration has the burden to "establish the existence of a valid arbitration agreement and that the claims at issue fall within the scope of that agreement." *Id*. at 720 (quoting *Henry v. Cash Biz, LP*, 551 S.W.3d 111, 115 (Tex. 2018)). "This is a two-step process, requiring the party to 'first establish the existence of an arbitration agreement' and then establish that 'the arbitration agreement covers the claims asserted." *Id.* (quoting *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 753 (Tex. 2001)).

A dispute over whether the parties to a contract agreed to resolve their controversies through arbitration, which is referred to as a dispute over arbitrability, typically encompasses three distinct disagreements: (1) the merits of the underlying controversy (here, whether Anadarko was paying proper royalties to Chevron); (2) whether the merits must be resolved in arbitration instead of in the courts (the scope of the arbitration provision); and (3) who (a court or the arbitrator) decides the second question. *Id*. at 701 (citing *RSL Funding, LLC v. Newsome*, 569 S.W.3d 116, 120 (Tex. 2018)). "The second question must be answered before the first, but the third must be answered before the second." *Id*. Accordingly, we begin with the third question, and we conclude that the parties here agreed to delegate the issue of arbitrability to the arbitrator. *Id.*

## V. DID THE PARTIES DELEGATE ARBITRABILITY TO THE ARBITRATOR?

### A. Arbitrability and the AAA rules

Although a court will typically resolve questions of arbitrability, the "parties can agree that that an arbitrator, rather than a court, must resolve disputes over the validity and scope of their arbitration agreement." *Id* at 702. (citing *Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d

624, 631 (Tex. 2018)). "If the parties have contractually agreed to delegate arbitrability disputes to the arbitrator, courts must enforce that agreement, just as they must enforce an agreement to delegate resolution of the underlying merits to the arbitrator." *Id*. (citing *RSL Funding*, 569 S.W.3d at 120). But a court "will only enforce an agreement to delegate arbitrability to the arbitrator if that agreement is 'clear and unmistakable.'" *Id.* (citing *Robinson*, 590 S.W.3d at 525, 532).

In *TotalEnergies*, the Texas Supreme Court recently held that because the AAA Commercial Arbitration Rules provide that arbitrability is to be decided by the arbitrator, "as a general rule, an agreement to arbitrate in accordance with the AAA or similar rules constitutes a clear and unmistakable agreement that the arbitrator must decide whether the parties' disputes must be resolved through arbitration."[7] *Id*. at 708. Whether parties have agreed to delegate arbitrability issues to an arbitrator is generally governed by "ordinary state-law principles that govern the formation of contracts." *Id.* at 702 (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). But because parties might not realize the significance of having arbitrators decide the scope of their own powers, and to avoid the risk of requiring parties to arbitrate a dispute they have not agreed to arbitrate, courts will only enforce an agreement to delegate arbitrability to the arbitrator if that agreement is "clear and unmistakable." *Id.*

## B. The parties' arguments

Anadarko argues that Exhibit N, which the parties incorporated into the MFA, contains a virtually identical delegation provision as the one in *TotalEnergies*, providing that all disputes "arising out of or relating to the Agreement . . . shall be conducted in accordance with the AAA's

---

[7] Rule 7(a) of the AAA Commercial Rules provides: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." *TotalEnergies E&P USA, Inc. v. MP Gulf of Mexico, LLC*, 667 S.W.3d 694, 700 (Tex. 2023), reh'g denied (June 9, 2023).

11

Commercial Arbitration Rules (the 'Rules') effective at the time of the dispute." Anadarko maintains that this clearly and unmistakably delegated arbitrability to the arbitrator, and the trial court erred in refusing to send the parties to arbitration for the arbitrator to decide arbitrability in the first instance.

Chevron acknowledges that Exhibit N contains language delegating arbitrability to the arbitrator. And Chevron neither challenges the validity of the arbitration agreement nor Exhibit N's delegation provision. Instead, Chevron maintains that Exhibit N's arbitration agreement simply does not apply to its dispute with Anadarko because of the limiting language in MFA section 16.11, which provides that Exhibit N will be applied to resolve disputes that "may arise under this Agreement." Chevron contends this limiting language demonstrated the parties' intent to apply Exhibit N only to disputes arising directly out of the terms of the MFA itself—such as whether Chevron was required to lease a certain prospect area to Anadarko—but not to disputes arising under the terms of the lease agreements—such as disputes over royalty calculations.[8] And because the parties' dispute involves a royalty calculation, Chevron argues, we should not apply Exhibit N.

Chevron argues that, as sophisticated business entities, they made an intentional choice to have only certain disputes, i.e., disputes over the MFA terms and over term assignments, sent to arbitration, while sending disputes over leases to the courts. Chevron therefore urges us to enforce

---

[8] Chevron notes that courts have traditionally distinguished between arbitration provisions that require arbitration of disputes that "arise under" an agreement, which are "narrow" in nature, and those that require arbitration of disputes that "relate to" the agreement, which are "broad" in nature. *See Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir.1998) (discussing the distinction between "'narrow' arbitration clauses that only require arbitration of disputes 'arising out of' the contract and broad arbitration clauses governing disputes that 'relate to' or 'are connected with' the contract"); *see also Bonded Builders Home Warranty Ass'n of Tex. v. Rockoff*, 509 S.W.3d 523, 532–33 (Tex. App.—El Paso 2016, no pet.) (referring to an arbitration provision that contained the phrase "relate to" as being a "broad arbitration clauses capable of expansive reach").

the parties' agreements as written and uphold the trial court's decision to deny Anadarko's motion to compel arbitration.

### C. Total energies and the severability rule

As a preliminary matter, we agree with Chevon that parties may choose to have certain types of disputes sent to arbitration, while having others decided in court; that is, they may carve out which disputes will be arbitrated and which will not. *See Coinbase, Inc. v. Suski*, 602 U.S. 143 (2024) (recognizing that "[p]arties can form multiple levels of agreements concerning arbitration, and thus can have different kinds of disputes" resolved in different manners). But Chevron's argument that the parties did not agree to subject royalty disputes to arbitration ignores the first step in the analysis: determining who is tasked with deciding which disputes the parties intended would be subject to arbitration and which would not.

In *TotalEnergies*, the Texas Supreme Court rejected an argument similar to Chevron's, concluding that when parties enter into a series of contracts, one of which has an arbitration agreement with a delegation provision giving the arbitrator the authority to decide arbitrability, it is for the arbitrator, not the court, to resolve whether the parties' dispute falls within the scope of the arbitration agreement. *TotalEnergies*, 667 S.W.3d at 720–21. There, the parties, MP Gulf of Mexico (MP Gulf) and TotalEnergies E&P USA (Total E&P), had entered into three agreements with three different dispute resolution provisions. *Id*. at 699–700. The System Operating Agreement (SOA) provided a method by which the two parties would operate within two different areas in which they owned mineral interests. *Id*. at 698. The SOA contained an arbitration agreement providing that all disputes "that arise out of their agreement" would be submitted to arbitration in accordance with the AAA Commercial Arbitration Rules. *Id*. at 699–700. The court

determined that this "delegation provision" delegated issues of arbitrability to the arbitrator, rather than to the courts. *Id*. at 719.

Attached to that agreement and incorporated by reference was a Cost Sharing Agreement (CSA) defining how the parties were to allocate costs under the SOA. *Id.* at 700. The CSA contained a forum selection clause providing that disputes were to be resolved by the Harris County courts. *Id*. MP Gulf moved to compel arbitration, citing to the SOA's arbitration agreement. *Id*. at 700. Total E&P opposed the motion, noting the SOA's arbitration agreement contained limiting language indicating that the parties only agreed to arbitrate disputes that "arise out of" that agreement, and arguing that the parties' dispute instead arose out of the CSA, which contained no such arbitration agreement. *Id*. at 700. Consequently, Total E&P argued, the SOA's delegation provision had no application to the dispute. *Id*.

In rejecting this argument, the court applied the "severability rule," which had two applications to the issue before it. First, the rule provides that "an agreement to arbitrate is severable from a broader contract that contains it"; therefore, "courts must require arbitration of challenges to the broader contract but must themselves decide challenges to the arbitration agreement unless the parties clearly and unmistakably agreed otherwise." *Id*. at 716 (citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70–71 (2010); *Baby Dolls*, 642 S.W.3d at 586). Second, the rule also applies to sever an arbitration agreement from "a provision contained within it that delegates arbitrability issues to the arbitrators." *Id*. at 716–17 (citing *Rent-A-Cntr.*, 561 U.S. at 71–72). Thus, the court noted it "must carefully distinguish between the parties' disputes over (1) the scope of the arbitration provision (what it includes and carves out) and (2) the delegation provision (who decides the scope of the arbitration provision)." *Id.* at 717. The court noted that Total E&P's argument addressed solely whether the arbitration agreement used limiting language that carved

out certain disputes to be arbitrated, which went to the scope of the arbitration agreement and not to the scope of the delegation provision, i.e., "the *scope of the arbitrator's authority* to decide questions of 'arbitrability.'" *Id.* at 719 (quoting *Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 848 (6th Cir. 2020)). In other words, the court recognized that "the fact that the parties' *arbitration agreement* may cover only some disputes while carving out others does not affect the fact that the *delegation agreement* clearly and unmistakably requires the arbitrator to decide whether the present disputes must be resolved through arbitration." *Id.* at 719. Thus, it held that when an agreement contains a clear and unmistakable delegation provision, a court is required to "enforce that provision as written and allow the arbitrator to decide the scope of the arbitration provision" in the first instance. *Id.* at 719 (citing *Rent-A-Ctr.*, 561 U.S. at 71–72). We draw the same conclusion in the case before us.

Here, the MFA incorporated numerous exhibits by reference, making them a part of the agreement itself, including Exhibit N, which contained the parties' arbitration agreement. *See id.* at 723–24 (Bland, J., concurring) (recognizing that "[u]nder ordinary contract-interpretation principles, a document incorporated by reference and attached as an exhibit is part of the agreement itself") (citing *In re Bank One, N.A.*, 216 S.W.3d 825, 826 (Tex. 2007)). Exhibit N provided that "[a]ny dispute arising out of or relating to the Agreement" was subject to arbitration in accordance with the AAA Commercial Arbitration Rules, which constituted a clear and unmistakable delegation of arbitrability to the arbitrator. Therefore, applying the severability rule as *TotalEnergies* requires us to do, we must carefully distinguish between (1) whether Exhibit N's arbitration agreement only extends to certain disputes that "arise under" the MFA itself, and (2) whether the parties delegated the authority to the arbitrator to answer that very question. *Id.* at 719. Chevron's argument solely addresses the first issue, i.e., whether the language in MFA section

15

16.11 was intended to limit arbitration only to disputes arising directly from the terms of the MFA itself, not to those arising under the terms of the lease agreements the parties signed pursuant to the MFA.

Chevron does not claim there is any similar language in the delegation provision which would limit the "scope of the delegation" to certain disputes and not to others. *Id*. at 718 (finding it significant that the delegation provision in the parties' contract did not contain any limitation on the "scope of the delegation"). Nor does Chevron contest the validity of the delegation provision itself. *See Coinbase*, 602 U.S. at 152 (recognizing that when the parties' arbitration agreement contains a delegation clause, "absent a successful challenge to [the] delegation provision, courts must send all arbitrability disputes to arbitration"); *Elite Townhomes, LLC v. Intown Constr. Group, LLC*, No. 14-22-00641-CV, 2024 WL 1107889, at *5 (Tex. App.—Houston [14th Dist.] Mar. 14, 2024, no pet.) (mem. op.) (because the party opposing arbitration only challenged the scope of the parties' arbitration agreement, but did not point to any language in the delegation provision that "limit[ed] their delegation of arbitrability issues to the arbitrator to only certain claims or to only certain arbitrability issues," the issue of arbitrability was for the arbitrator to decide).

Accordingly, to the extent that Chevron seeks to use the limiting language in MFA section 16.11 to limit the scope of the delegation provision, its argument improperly conflates the two issues. *See TotalEnergies*, 667 S.W.3d at 714 (holding that arguments over the scope of an arbitration agreement "conflates the parties' agreement to arbitrate disputes with their agreement to delegate arbitrability issues to the arbitrator"). We therefore conclude that any limiting language in MFA section 16.11 "does not affect the agreement's clear and unmistakable delegation of arbitrability issues to the arbitrator." *Id*. at 712, 720. As the court recognized in *Total Energies*, if

we were to hold otherwise and undertake the task of determining in the first instance how broadly an arbitration provision should be construed, it would render the parties' agreement to delegate the issue of arbitrability to the arbitrator "meaningless," as "[a] rule that requires arbitrators to determine arbitrability only after a court has already determined arbitrability essentially has no effect at all." *Id.* at 714.

### D. The placement of the delegation provision in Exhibit N

Chevron seeks to distinguish the court's holding in *TotalEnergies* by arguing that its holding was premised on the fact that the parties "simultaneously executed" the SOA (which contained the arbitration provision) and the CSA (which contained the forum selection clause), and the court was therefore able to treat the two agreements as a unified or "integrated" contract. In contrast, Chevron finds it significant that the MFA and lease agreements in this case were not simultaneously executed. Chevron therefore urges us to treat the lease agreements as separate contracts to which the MFA dispute resolution provisions would not apply.

In making this argument, Chevron provides an example of a situation in which the same two parties enter into entirely separate sales contracts for different purchases on different occasions, with conflicting dispute resolution provisions—one of which calls for arbitration and one of which either expressly or impliedly calls for dispute resolution in the courts. Relying on the United States Supreme Court's recent holding in *Coinbase*, Chevron contends that a court should not apply the arbitration provision found in one of the parties' contracts to the other unrelated contract. In *Coinbase*, the parties entered into two separate contracts on two separate occasions, and the contracts had conflicting dispute resolution provisions.[9] *See Coinbase*, 602 U.S. at 152.

---

[9] In *Coinbase*, the parties first entered into a "User Agreement," in which the petitioner Coinbase, Inc. agreed to allow the respondents, a group of individuals, to use its cryptocurrency exchange platform to buy and sell cryptocurrency. *Coinbase, Inc. v. Suski*, 602 U.S. 143 (2024). The User Agreement contained an arbitration provision in which the parties clearly and unmistakably delegated the issue of arbitrability to the arbitrator. *Id.* Thereafter, Coinbase created

17

There, the U.S. Supreme Court held it was necessary to determine which of the parties' two contracts controls before determining which of the conflicting dispute resolution provisions applied to the parties' dispute. *Id.* (recognizing that where "parties have agreed to *two* contracts—one sending arbitrability disputes to arbitration, and the other either explicitly or implicitly sending arbitrability disputes to the courts—a court must decide which contract governs"); *see also McFarlane v. Altice USA, Inc.*, 524 F. Supp. 3d 264, 279 (S.D.N.Y. 2021) (holding that an arbitration agreement found in a contract could not be applied to the plaintiff's claim to the extent the claim lacked "any nexus" to the contract in which the arbitration agreement was contained).

But this is not the case here, as we cannot view the MFA (which included the arbitration provision) and the lease agreements (which were silent on the issue of dispute resolution) as entirely separate agreements. The MFA and the lease agreements, despite being signed at different times, are connected to each other, as the executed lease agreements were all entered into pursuant to the terms of the MFA itself, and they incorporated various MFA references just as the lease agreement form itself was incorporated by reference into the MFA. *See TotalEnergies*, 667 S.W.3d at 724 (Bland, J., concurring) (recognizing that "[i]nstruments pertaining to the same transaction may be read together to ascertain the parties' intent, even if the parties executed the instruments at

---

a sweepstakes giveaway, which allowed users of the platform to enter a chance to win Dogecoin. *Id.* Respondents each submitted entries in the sweepstakes, and in so doing, agreed to a second, independent agreement with Coinbase known as the "Official Rules" of the sweepstakes. *Id.* Unlike the User Agreement, the Official Rules agreement contained a forum selection clause providing that California courts "shall have sole jurisdiction of any controversies regarding the [sweepstakes] promotion." *Id.* at 146–47. Thereafter, a dispute arose solely over the manner in which Coinbase conducted the sweepstakes, and Coinbase moved for arbitration citing to the arbitration provision in the User Agreement. The lower courts, however, held that the Official Rules agreement governed the dispute, and denied Coinbase's motion to compel arbitration. *Id.* at 147. In affirming the lower courts' ruling, the U.S. Supreme Court held that, in this situation, it was for the courts to determine which of the parties' two contracts governed their dispute, and it found no error in the lower courts' conclusion that the Official Rules agreement governed the dispute. *Id.* at 152. The Supreme Court emphasized, however, that this did not obviate the rule that when "parties have agreed to only one contract, and that contract contains an arbitration clause with a delegation provision, then, absent a successful challenge to the delegation provision, courts must send all arbitrability disputes to arbitration." *Coinbase*, 602 U.S. at 152.

different times") (quoting *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000)).

As Anadarko points out, this is not unlike the situation in *TotalEnergies* in which the parties included an arbitration agreement in their SOA, with a clear and unmistakable delegation provision, but did not include one in the CSA that was attached to the SOA—and in fact included an entirely different dispute resolution provision in the CSA calling for resolution in the courts. In finding that it was required to enforce the delegation provision contained in the SOA as written, the court in *TotalEnergies* explained that an arbitration provision need not be "included in each of the contract documents it purports to cover"; "[s]o long as the parties agreed to arbitrate this dispute, it does not matter which document included that agreement." *TotalEnergies*, 667 S.W.3d at 720 (citing *In re AdvancePCS Health L.P.*, 172 S.W.3d 603, 606 (Tex. 2005); *Romero v. Herrera*, No. 04-18-00845-CV, 2019 WL 2439107, at *3 (Tex. App.—San Antonio June 12, 2019, no pet.) ("[T]he scope of an arbitration agreement turns on its terms, not on the particular written instrument in which the arbitration agreement appears.")); *see also Elite Townhomes*, 2024 WL 1107889, at *5 (where the parties entered into a series of contracts relating to their joint construction ventures, at least two of which contained arbitration agreements delegating arbitrability to the arbitrator, the question of whether the parties' dispute fell within the scope of the arbitration agreements, or whether it instead arose under a separate contract that did not contain an arbitration agreement, was for the arbitrator to decide). Therefore, the court held that, as a matter of contract law, it was required to allow the arbitrator to determine in the first instance if the parties intended for their dispute to be resolved by an arbitrator or by a court. *TotalEnergies*, 667 S.W.3d at 719–21.

We similarly conclude that, given the clear and unmistakable delegation provision in the parties' MFA, the question of whether the parties intended for their dispute to be resolved in arbitration rather than in the courts is for the arbitrator to decide in the first instance. *Id*. We note that the "parties will remain free to raise their disagreements concerning arbitrability in the arbitral forum" and may challenge the arbitrator's decision if they believe it "exceeded the scope of the arbitrator's power." *See TotalEnergies*, 667 S.W.3d at 725 (Bland J., concurring).

Anadarko's Issues One and Four are sustained.[10]

## VI.  CONCLUSION

Because the trial court erred, we reverse its order denying Anadarko's motion to compel arbitration and granting Chevron's motion to stay arbitration. We remand to the trial court with directions to lift the stay of the arbitration and stay any further proceedings in the trial court pending a decision from the arbitrator.

LISA J. SOTO, Justice

December 11, 2024

Before Alley, C.J., Palafox, Soto, JJ.
Palafox, J., dissents without opinion.

---

[10] Because we rule in favor of Anadarko on Issues One and Four, we do not reach Issue Two in which Anadarko argues in the alternative that if we decide that the delegation provision does not apply, we should conclude that the parties intended for their dispute to be decided through arbitration.